**Marilyn GALDIERI–AMBROSINI,**
**Plaintiff–Appellant,**

v.

**NATIONAL REALTY & DEVEL-**
**OPMENT CORP., Defen-**
**dant–Appellee.**

No. 88, Docket 96–9447.

United States Court of Appeals,
Second Circuit.

Argued Aug. 27, 1997.

Decided Feb. 4, 1998.

Jacqueline DeSalvo, White Plains, NY (DeSalvo & Rovira, White Plains, NY, on the brief), for Plaintiff–Appellant.

Steven H. Gaines, White Plains, NY (Pirro, Collier, Cohen & Halpern, White Plains, NY, on the brief), for Defendant–Appellee.

Before: KEARSE and McLAUGHLIN, Circuit Judges, and TRAGER, District Judge[*].

KEARSE, Circuit Judge:

Plaintiff Marilyn Galdieri–Ambrosini ("Ambrosini") appeals from so much of a judgment of the United States District Court for the Southern District of New York, Jed S. Rakoff, Judge, as dismissed her complaint against defendant National Realty & Development Corp. ("National Realty") for alleged gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. (1994). Following a jury verdict in Ambrosini's favor for a total of $100,000 in compensatory and punitive damages, the district court entered judgment as a matter of law in favor of National Realty on the ground that, based on the evidence presented, no reasonable juror could have found that National Realty had discriminated against Ambrosini on the basis of gender. On appeal, Ambrosini contends that judgment as a matter of law was improperly granted (1) because National Realty's motion for that relief prior to the jury's commencement of deliberations was not sufficiently specific to reach her claim of unlawful retaliation, and (2) because the evidence was sufficient to allow a reasonable juror to find gender discrimination and retaliation. Though we have difficulties with some of the procedural aspects of the case, we conclude that judgment as a matter of law was appropriate, and we therefore affirm.

* Honorable David G. Trager, of the United States District Court for the Eastern District of New York, sitting by designation.

## I. BACKGROUND

During the pertinent period, National Realty was a real estate company whose business included developing new properties and leasing properties that it owned and managed. It had, inter alia, a retail leasing department and a commercial leasing department. The director of the retail leasing department was Clifford ("Cliff") Simon. In November 1993, National Realty hired Ambrosini to work as Simon's secretary.

Ambrosini had received a college degree in 1990 and a paralegal certificate in 1991. She had had some sixteen years of experience as a secretary with five employers and was proficient with office computer software. At National Realty, Ambrosini's secretarial duties for Simon included typing, filing, answering the telephone, generating form letters, preparing marketing packages for mass mailings, and, for a time, maintaining Simon's database of tenants. As described below, Ambrosini was also required to perform work for Simon on certain of his personal matters.

Ambrosini was fired in November 1994. National Realty asserted that the reason was poor work performance. Ambrosini commenced the present action, alleging that National Realty had discriminated against her on the basis of age and gender, and had retaliated against her, in violation of Title VII. The action was tried to a jury. The main points of Ambrosini's testimony as to the basis for her claims are summarized below. Since, in reviewing the granting of judgment as a matter of law against Ambrosini we consider the trial evidence in the light most favorable to her, we omit reference to the evidence presented by National Realty except to the extent that it could reasonably have been viewed as supporting Ambrosini's claims.

### A. Ambrosini's Evidence at Trial

One of Ambrosini's principal complaints was that she was overworked at National Realty, largely because of the conduct of "BJ" Olivieri, a receptionist, and of Dana

Cinque, a secretary in the commercial leasing department. Olivieri was hired by National Realty as a receptionist in June 1994. Ambrosini described her as "a female about—in her early 20s, petite, very well kept, very nice in her appearance like she had very beautiful fingernails. I remember them. They were always long and manicured. She loved jewelry. She was a very attractive young woman." (Transcript of Trial, October 9–11 ("Tr.") 129.) Simon and office manager Patricia ("Tesha") Chiaro had told Ambrosini that one of the jobs of the receptionist was to help Ambrosini compile and mail the marketing packages. There came a time, however, when Olivieri stated that she was no longer responsible for assisting in that task. Ambrosini complained to Simon, and perhaps to Chiaro, but they did nothing.

Cinque, described by one of Ambrosini's witnesses as a 5'7" blond woman who wore short skirts and tight clothes, was a secretary who reported to Jerry Birmingham, director of the company's commercial leasing department, and to his assistant. Cinque was frequently absent because of doctors' appointments, often arrived late or left early, and took numerous smoking breaks. When Cinque was away from her desk, Ambrosini was responsible for covering the telephones and performing other tasks for the commercial leasing department; Cinque's absences resulted in more work for Ambrosini. Ambrosini complained to Simon; he did not speak about the matter with Cinque and, so far as Ambrosini was aware, took no action. She also complained to Chiaro, who took no action. Ambrosini testified that she never observed Birmingham or his assistant reprimand Cinque for taking time away from work.

Ambrosini herself had requested permission to leave the office early on two occasions. Once she wanted to visit her mother-in-law in the hospital; Simon inquired why she could not complete the work day and make her visit afterwards; Ambrosini followed that suggestion. On the other occasion, Ambrosini asked to leave early because of the weather; Simon allowed her to leave a bit early but not as early as she had requested.

Ambrosini also complained that two male employees, Matt Brudner and Thor Headley, neither of whom was a secretary, spent time during business hours on personal matters. Brudner, a recent college graduate who was the son of a friend of the company's president, was hired to work in site acquisitions and reported to Simon. Brudner traveled a good deal to inspect various sites. When he was in the office he spent time on his personal problems. Headley, an assistant site acquisitions manager who reported at first to the company's vice president in charge of retail leasing, and later to Simon, received numerous telephone calls from his girlfriend. When Headley was away from his office, it was Ambrosini's responsibility to try to find him. Ambrosini complained to Simon that Headley's "girlfriend call[ed] quite frequently, like 20 times a day. Either they missed each other or they had a lot to share"; Ambrosini told Simon "it was an interference with my workday and the things I had to do." (Tr. 118, 119.) Simon said he was aware of the problem. However, Ambrosini never observed Simon reprimand Headley or Brudner for the time they spent on personal projects. In contrast, Ambrosini felt that Simon intimidated her. He once hovered over her when she was talking to her husband on the telephone.

Ambrosini's other major complaint was that Simon required her to perform work on his personal matters. Once, as he was leaving his office, he asked her to remove his coffee cup from his desk. On another occasion, he had her call his dry cleaners and attempt to negotiate payment for a lost shirt; this required several calls because the manager was unavailable and did not return Ambrosini's calls. Ambrosini's work for Simon on his personal affairs peaked in the spring and summer of 1994 when he was in the process of buying a house. For example, he had Ambrosini type letters and mortgage applications, photocopy documents, fax materials to his bank, and type lists of projects for renovation contractors. He had her call the cable installer to set up an appointment at a time that Simon or his wife could be at home. Ambrosini fielded many calls from Simon's realtor. Simon also once asked Ambrosini to

deal with a package that had been delivered to his house for the previous tenants; if she could not locate them, she was to have the delivery company retrieve the package.

Ambrosini objected to performing work for Simon on these personal matters, and she complained twice to him and once to Chiaro. She first complained in August or September 1994, telling Simon that doing work on his personal matters was "really inappropriate and that I had work to do for the company," and that "[i]t was time consuming for me to do all his personal things." (Tr. 152.) Simon did not respond and continued to give her such tasks. She complained to him again in early October, when he asked her to deal with the package addressed to the former tenants of his house: "again, I told him, you know, Cliff, you continue to give me the personal work again. I reiterated it was a problem and it was a conflict for me and just said, you know, I think I would really like to know what the company policy is on doing this, do you know?" (Tr. 153.) Ambrosini testified that Simon's response was that "he didn't have the time to do it. I said, wouldn't it be appropriate for your wife to do it?" (*Id.*) Simon responded that his wife did not have time either and that Ambrosini would have to do the work. Ambrosini then complained to Chiaro:

Q. What did you say to Tesha?

A. I asked Tesha what the company policy was on doing personal work for your boss, that Cliff was giving me a lot of personal work; and I just really wanted to clarify the policy.

Q. And what did Tesha say to you?

A. Tesha said to me I had to deal with it with Cliff.

. . . .

She said, well, there was really no policy and that I had to go back and I just had to deal with Cliff.

(Tr. 154.)

A month or two after the complaint to Chiaro and the second complaint to Simon, Ambrosini was fired.

## B. *Ambrosini's Theories of Liability*

At the close of Ambrosini's case in chief, National Realty moved pursuant to Rule 50(a) of the Federal Rules of Civil Procedure for judgment dismissing Ambrosini's claims as a matter of law. The district court granted the motion with respect to Ambrosini's claim of age discrimination, a decision not challenged on this appeal. The court declined at that time to dismiss the claims of gender discrimination and retaliation.

At the close of all the evidence, National Realty renewed its Rule 50(a) motion, seeking the dismissal of the remaining claims. The court heard extensive argument from Jacqueline DeSalvo, Ambrosini's counsel, in opposition. DeSalvo argued that Ambrosini had been the victim of gender discrimination "as a result of being held to a sexual stereotype of what a female is in our society and in our workplace." (Tr. 576.) Referring to BJ Olivieri and Dana Cinque, DeSalvo stated:

We will argue that the other women who are under the direct supervision to varying degrees, as was Miss Ambrosini, under the direct supervision of Mr. Simon, were not treated in the same manner, ... were treated less harshly, and we will assert numerous facts from which I believe the jurors may infer that it was because the women conformed to a sexual stereotype where Miss Ambrosini did not.

... [W]e know that BJ who was hired as the receptionist in June of 1994 was in her early twenties, she was young, she was petite, she was attractive, she dressed nicely, she had long nails. The plaintiff was told by Mr. Simon that this receptionist would be required to help her with some tasks. The evidence shows that there were times that she did not and that is corroborated by Mr. Simon. The evidence shows that Mr. Simon did not speak to the office manager about the fact that BJ was not assisting Miss Ambrosini, and he did not speak with BJ herself about the fact that she was not assisting Miss Ambrosini.

(Tr. 580–81.)

Dana brought Mr. Simon coffee unsolicited and she also cleaned away his coffee cup. This is something that Miss Ambrosini ob-

jected to. This is conforming to a sexual stereotype. The jurors may infer that because Dana [Cinque] looked a certain way, acted a certain way, made Mr. Simon's life more pleasant in the workplace, even if it was something as simple as bringing him coffee, she conformed to the sexual stereotype and she did not complain about it. (Tr. 587–88.) In response to questioning by the court, DeSalvo stated that the point was that Simon had a view of women that led him to overlook performance flaws in "young attractive female[s]," which led to increased burdens for the "older less attractive plaintiff." (Tr. 585–86.)

DeSalvo argued that, rather than assigning his personal tasks to Ambrosini, thereby "requiring her to conform to a sexual stereotype," Simon should "more properly" have "directed [those tasks] to Matt Brudner."(Tr. 594.)

Ms. DeSalvo: ... Mr. Brudner ... we're going to argue was really not hired because he was qualified for any particular management position. He was hired in the company because he is the son of the best friend of the owner of the company....

The Court: And what follows[?]

Ms. DeSalvo: Well, it's in evidence.

The Court: Assume that's the reason he was hired. What does that show about gender discrimination?

Ms. DeSalvo: It shows that in addition to having to repel hormones, we apparently are going to have to repel familial favoritism.

(Tr. 593.) DeSalvo asked, "Why wasn't Matt Brudner given the responsibility?" (Tr. 594), and argued that

[t]he reason [Simon] did not give the tasks to Matt Brudner is because Matt Brudner is a man and Miss Ambrosini is the wom[a]n who is supposed to conform to the sexual stereotype, to do the tasks that would be expected of women in our society....

(Tr. 595.)

After hearing the arguments, the district court indicated its view that National Realty was entitled to judgment as a matter of law.

However, the court noted this Court's prior observations that even if the trial judge has such a view at the close of the evidence, the prudent course of action is to submit the case to the jury and to grant judgment as a matter of law, if necessary, after the verdict has been returned, so that if the court of appeals eventually determines that judgment should not have been granted as a matter of law, the need for a second trial will be avoided. *See, e.g., Konik v. Champlain Valley Physicians Hospital Medical Center*, 733 F.2d 1007, 1013 n. 4 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 166 & n. 2 (2d Cir.1980). Accordingly, the court reserved decision.

In summation, DeSalvo explained Ambrosini's Title VII premises to the jury:

We have three theories. The first theory is that Miss Ambrosini was treated differently in a disparate manner than the other people similarly situated to her in her immediate work environment. She was treated differently than the women who were under Mr. Simon's direct supervisory control and she was treated differently than the men who were under Mr. Simon's direct control....

Our second theory is based on what's called a hostile environment theory, and we are alleging that by both the differences in the treatment which Miss Ambrosini suffered as a result of the conduct of Mr. Simon created a hostile environment that Miss Ambrosini was required to work in, as well as the direct conduct that she received as a result of Mr. Simon's direction.

....

Our third theory is a claim of retaliation. And it is a relatively simple claim. It will require you to determine whether Miss Ambrosini complained about a practice by Mr. Simon that she believed was unlawful and whether she was retaliated [*sic*] and effectively terminated as a result of that complaint.

Now, those are all Title 7 theories. With respect to the differences in treatment that Miss Ambrosini suffered, our theory rests entirely for the disparate treatment and the hostility on a claim that Miss Ambrosini was required to conform to a certain sexual stereotype. . . .

It is our position that there are certain prevailing sexual stereotypes that exist in our society with respect to women. . . . And it is our position that Miss Ambrosini was required to conform to the stereotype, and because she did not conform to the stereotype, she was adversely treated in her employment and ultimately terminated.

(Tr. 629–31.) DeSalvo argued that Dana Cinque, in contrast to Ambrosini, was treated well because she conformed to the stereotype: "Dana was favored in the company. . . . She took no exception to bringing [Simon] his coffee and cleaning up his desk" (Tr. 635–36); "Dana voluntarily brought Mr. Simon his coffee and she voluntarily removed his used coffee cups" (Tr. 634–35).

Referring to Ambrosini's testimony regarding her objections to being required to perform personal tasks for Simon, DeSalvo argued:

The most important aspect of our theory of Marilyn being held to a sexual stereotype is really focused on the personal tasks that Mr. Simon directed her to do at the office. And in this regard, it is not the plaintiff's position that in no circumstances should any employee ever do a personal task for their boss. That is not what our position is. And it is also not our position that when an employee may perform a personal task for their boss that that necessarily means that that is gender discrimination and that person is being held to a sexual stereotype.

Our position is that in this particular case with these particular tasks and the nature of these particular tasks and the directions that Mr. Simon gave to Marilyn Ambrosini with these tasks was holding her to an impermissible sexual stereotype which affected her condition of employ-

ment and ultimately caused her to be terminated for complaining about it. . .

(Tr. 644.)

### C. The Jury's Verdict; the Granting of Judgment Against Ambrosini

Ambrosini asked the court to submit two special interrogatories to the jury as follows:

1. Do you find that National Realty discriminated against plaintiff on the basis of gender because she was subjected to an intimidating, hostile, or offensive work environment that had the effect of unreasonably interfering with her work performance and for which National Realty had responsibility.

2. Do you find that thereafter she was wrongfully terminated, either because she refused to submit to such harassment or in retaliation for complaining about the harassment she suffered.

The court declined to pose these questions; it stated that it rarely submitted special interrogatories to the jury.

After giving the jury general instructions as to such matters as assessment of the credibility of witnesses, the use of circumstantial evidence, and the meaning of preponderance of the evidence, the court gave the following instructions with respect to the nature of Ambrosini's claim:

Specifically, plaintiff claims that she was the subject of discrimination on the basis of gender on the part of her former employer, National Realty. If, and only if, you find that the defendant is liable on this claim, do you then go on to determine the damages to be paid by the defendant, about which I will instruct you later. If you find that the defendant is not liable of [sic] this claim, then you do not consider damages at all.

As already mentioned, Miss Galdieri-Ambrosini claims that National Realty discriminated against her on the basis of gender. Specifically, she claims that on account of her gender, she was subjected to what a reasonable wom[a]n would perceive as an intimidating, hostile, or offensive work environment that had the effect of unreasonably interfering with her work performance and for which National Real-

ty had responsibility; and that thereafter she was wrongfully terminated, either because she refused to submit to such harassment or in retaliation for complaining about the harassment she suffered.

While any one of these contentions, if established by a preponderance of the evidence, will support plaintiff's claims of gender discrimination, National Realty denies plaintiff suffered any harassment and further asserts that she was terminated for poor performance. In assessing this debate, keep in mind that the question is not whether National Realty exercised good or poor judgment in setting plaintiff's work conditions or firing her. National Realty would be entitled to make a decision[ ] for good reasons, bad reasons, or for no reason at all, so long as their decisions were not motivated by the gender discrimination here alleged. It is a plaintiff's burden to persuade you, by a preponderance of the evidence, that the defendant took the actions of which the plaintiff complained because of her gender. While a plaintiff need not establish that gender was the only motivating factor in the defendant's actions, a plaintiff must prove by a preponderance of the evidence that it was a motivating factor, or else you must find for the defendant.

Now, if you do determine liability, then you must consider damages, so let's turn to the instruction on damages.

If, and only if, you find the defendant liable for gender discrimination, then you must determine the sums of money that must be paid to the plaintiff as a result of such liability.

(Tr. 684–86.)

After giving instructions with respect to compensatory and punitive damages, the court submitted the case to the jury with a verdict form containing a single question as to liability, along with contingent questions as to damages:

You will be bringing with you into the jury room a copy of my instructions of law. I will shortly send you as well a verdict form on which to record your verdict.

.... The verdict form is this one page document and it has first the question of whether you find the defendant liable or not liable of [sic] the charge. If you find the defendant not liable, then you simply sign the form and that's the end of that. If you find the defendant liable, you go on to answer the other questions [as to compensatory and punitive damages].

(Tr. 689.)

The jury eventually returned a verdict in favor of Ambrosini, finding National Realty liable on the "gender discrimination claim." (Transcript of Trial, October 15, 1996 ("Oct. 15 Tr.") 14.) The jury awarded $12,500 in compensatory damages, plus $87,500 in punitive damages.

National Realty promptly renewed its motion for judgment as a matter of law. After hearing argument from the parties, the court stated that it "could find no evidence of gender discrimination." (Oct. 15 Tr. 21.) "I could not find anything in the record that would persuade a reasonable person that there had been gender discrimination as the motivation for any of the things complained of." (Id. at 22.) Ambrosini contended that the court nonetheless should not disturb the verdict in her favor because even if gender discrimination was not proven, the jury could have found in her favor on the claim of retaliation. She argued that National Realty's Rule 50(a) motion had not presented a sufficiently specific challenge to the evidence of retaliation. She also argued, apparently for the first time, that in order to succeed on that claim, she need not have proven gender discrimination so long as she demonstrated a good faith, reasonable belief that the conduct of which she complained violated Title VII.

The district court pointed out that Ambrosini had not argued to the jury her alternative theory that a verdict could be returned in her favor even if the jury found that there was no gender discrimination, and the court concluded that the verdict should not be sustained on the supposition that the jury had adopted a theory not presented to it. The court found that National Realty's Rule 50(a) motion had adequately addressed the retaliation claim, given the nature of that claim as argued to the jury, and concluded that the absence of any proof of gender discrimination

required the dismissal of the retaliation claim as well.

Judgment was entered dismissing the complaint in its entirety. This appeal followed.

## II. DISCUSSION

On appeal, Ambrosini argues (1) that National Realty's Rule 50(a) motion was not sufficiently specific with respect to her claim of retaliation, and hence the court could not properly grant judgment as a matter of law dismissing that claim; and (2) that the evidence was sufficient to allow a rational juror to find in favor of Ambrosini on both her claim of gender discrimination and her claim of unlawful retaliation. We find several of the procedural aspects of this case troubling. However, we conclude that the procedural deficiencies were harmless in the circumstances, and that National Realty was entitled to judgment as a matter of law.

### A. Procedural Issues

#### 1. The Instructions and the Form of the Verdict

We are somewhat hampered in our review of the district court's decision because of the generality of the instructions given to the jury and the lack of specificity in the verdict it returned. When the case was submitted to the jury, Ambrosini had two undismissed Title VII claims, one alleging gender discrimination, and the other alleging retaliation against her on the basis of her complaints about her working conditions. The elements of these claims are not identical. As discussed in Part II.B. below, in order to establish her claim of discrimination, Ambrosini was required to show that National Realty discharged her, or discriminated against her with respect to the conditions of her employment, on the basis of her gender. In contrast, as set out in Part II.C. below, in order to establish her claim of Title VII-prohibited retaliation, Ambrosini was required to show, *inter alia*, that she had engaged in activity protected by Title VII, that National Realty was aware of that activity, and that National Realty made an employment decision adverse to her because of that activity. Even if an employee is not the victim of prohibited discrimination, Title VII protects her against retaliation for protesting against such discrimination. *See generally Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).

The instructions given by the district court to the jury, quoted in Part I.C. above, did not set out the elements of a claim for retaliation. Although the court iterated Ambrosini's contentions and included mention of her contention that she had been discharged "in retaliation for complaining about the harassment she suffered" (Tr. 685), retaliation was not mentioned again, and the court did not distinguish that claim in any way from the claim of discrimination. Thus, while the court indicated that liability could be premised on "any one of [Ambrosini's] contentions" (*id.*), it consistently referred to her claim only as one for discrimination on the basis of her gender. These instructions were not sufficient to give the jury guidance as to the elements of a claim of retaliation.

We note that Ambrosini, after preliminarily reviewing the court's proposed charge, objected that, as proposed, "the charge did not contain the standards that would be necessary for the jury to find on the issue of retaliation." (Tr. 611–12.) In the colloquy following that objection, however, Ambrosini did not suggest language to cure that problem; nor do we see any indication in the record that she objected on this basis after the charge was given. Indeed, on appeal, Ambrosini does not contend that she should have a new trial because of the flawed instruction. Rather, despite the absence of any instructions as to the elements of a retaliation claim, she contends that we should assume that the jury found retaliation. Since the court mentioned retaliatory discharge as one of the bases that could support her claim of liability, and since the jury, during its deliberations, requested information about the dates of Ambrosini's complaints and termination, it is perhaps possible that the jury found what it considered to be retaliation. However, in the absence of any instructions as to the elements of retaliation, we have no way of discerning whether the

jury's notion of retaliation conformed to the law.

■ Moreover, because the district court furnished the jury with a verdict form that did not differentiate between the claim of discrimination and the claim of retaliation, and instead posed only a single liability question, we cannot know on what basis the jury found in Ambrosini's favor. Where two (or more) claims are submitted to the jury, a form of verdict that does not require the jury to specify on which claim or claims it finds in favor of the plaintiff may pose an insurmountable problem for review of the verdict. Assume, for example, that the evidence were sufficient to support one of the plaintiff's two claims but not the other. If the defendant made an adequate Rule 50(a) motion (*see* Part II.A.2. below) as to the claim on which the evidence was insufficient, the defendant would be entitled to prevail if the jury found for the plaintiff only on that claim; but the plaintiff would be entitled to prevail if, instead, the jury found in her favor either on both claims or only on the claim as to which the evidence was sufficient. A verdict that did not specify on which of the plaintiff's claims the jury found in her favor would leave both the district court and this Court unable to determine which party should prevail and would likely require a new trial. A similar difficulty could result if the evidence were insufficient on both of the plaintiff's claims, for if the defendant's Rule 50(a) motion were adequate as to one of those claims but inadequate as to the other, the defendant would normally not be entitled to prevail if the jury found in favor of the plaintiff on the claim as to which the motion was inadequate. In this circumstance as well, a verdict that did not disclose on which of the claims the jury found in the plaintiff's favor would leave us unable to determine which party should prevail and lead us to remand for a new trial. Thus, when more than one claim is submitted to the jury, the trial court should foreclose the possibility of an ambiguous verdict by requiring the jury to specify its liability finding as to each claim.

In the present case, we conclude that the lack of specificity in the verdict in favor of Ambrosini was harmless in light of other conclusions we reach below.

### 2. The Sufficiency of the Rule 50(a) Motion as to Retaliation

■ Under Rule 50(a), a party may move for judgment as a matter of law ("JMOL") during trial at any time prior to the submission of the case to the jury. Fed.R.Civ.P. 50(a)(2). The Rule requires the party making such a motion to "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." *Id.* After an unfavorable verdict, Rule 50(b) allows the party to "renew" its motion. "The posttrial motion is limited to those grounds that were 'specifically raised in the prior motion for [JMOL]'"; the movant is not permitted to add new grounds after trial. *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir.1997) (quoting *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993)); *see, e.g., Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994) ("*Cruz v. Local Union No. 3*"); *Lambert v. Genesee Hospital*, 10 F.3d 46, 53–54 (2d Cir.1993) ("the specificity requirement is obligatory"), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 367 (2d Cir.1988).

■ Although Rule 50(a) "does not define how specific" the motion must be, *Anderson v. United Telephone Co.*, 933 F.2d 1500, 1504 (10th Cir.), *cert. denied*, 502 U.S. 940, 112 S.Ct. 375, 116 L.Ed.2d 327 (1991), the purpose of requiring the moving party to articulate the ground on which JMOL is sought "is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury," *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir.1986) (internal quotation marks omitted). "The articulation is necessary ... so that the responding party may seek to correct any overlooked deficiencies in the proof." Fed.R.Civ.P. 50 Advisory Committee Note (1991). Accordingly, the JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported. *See, e.g., Cruz v. Local*

*Union No. 3*, 34 F.3d at 1155 (motion challenging the adequacy of grievances and exhaustion of remedies did not challenge the issue of damages); *Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir.1993) (conclusory statement that "[d]efendants move for [JMOL]" was inadequate). We must, however, view the motion in the context of the ensuing colloquy between counsel and the trial court, and if that colloquy fleshes out the motion, it may provide the opposing party with the requisite notice. *See, e.g., Gordon v. County of Rockland*, 110 F.3d 886, 887 n. 2 (2d Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 74, 139 L.Ed.2d 34 (1997); *Acosta v. Honda Motor Co.*, 717 F.2d 828, 832 (3d Cir.1983).

The ultimate question is whether the motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof. If specificity was lacking, JMOL may neither be granted by the district court nor upheld on appeal unless that result is " 'required to prevent manifest injustice.' " *Cruz v. Local Union No. 3*, 34 F.3d at 1155 (quoting *Baskin v. Hawley*, 807 F.2d at 1134).

In the present case, National Realty's counsel Steven H. Gaines, in first arguing the company's pre-verdict motion for JMOL, stated as follows:

> I move under Rule 50 for a dismissal of the action against the defendant. I believe upon any reasonable reading of the evidence by anyone, no one could possibly come to the conclusion that Miss Ambrosini received disparate treatment because of her age or her gender and certainly the testimony has—under no reasonable view of the testimony could there possibly be a finding that the testimony of Miss Ambrosini would support a finding that there was some hostile work environment that was created which caused her to be discriminated against because of her sex or her age.

(Tr. 280.) With respect to the claim of gender discrimination, this motion was adequately specific to the extent of challenging the sufficiency of the evidence to show either a hostile work environment or disparate treatment of Ambrosini because of her gender.

At this point, defense counsel had not mentioned the claim of retaliation, and the district court interrupted him and engaged Ambrosini's counsel in a lengthy discussion about the evidence of discrimination. At the conclusion of that colloquy, Ambrosini's counsel asked whether National Realty's Rule 50(a) motion was meant to encompass the retaliation claim. The court stated that it had not heard National Realty's counsel include that claim. Gaines then indicated that the retaliation claim was included in his Rule 50(a) motion on the same grounds that he had advanced with respect to the gender discrimination claim: "I think that they follow. The issues are the same. There is no evidence, your Honor. I think that flows right through every cause of action." (Tr. 298.) We conclude that, given Gaines's reference to his earlier arguments, the Rule 50(a) motion was sufficient to cover the claim of retaliation to the extent that the retaliation claim assertedly would fail if there were no evidence that Ambrosini had been the victim of disparate treatment or a hostile environment on the basis of her gender.

As discussed in Part II.C. below, however, a retaliation claim may in some instances be established even where there has been no Title VII-prohibited discrimination, *i.e.*, where the plaintiff shows, *inter alia*, that she had a good faith, reasonable belief that the conduct she opposed violated Title VII and that the employer could reasonably have understood that Title VII-prohibited discrimination was the subject of her protest. With respect to this alternative theory of retaliation, Gaines contended at oral argument in this Court that not only was the evidence insufficient to show gender discrimination, but it also was insufficient to show that National Realty could reasonably have understood that Ambrosini's complaints about having to do extra work because of the conduct of her two female co-workers, about having to locate Headley for the numerous calls from his girlfriend, and about having to do work on Simon's personal matters, actually constituted complaints that she was being discriminated against on the basis of gender. At trial, however, Gaines's argument of National Realty's Rule 50(a) motion did not

address Ambrosini's alternative theory of retaliation and did not challenge the sufficiency of the evidence to show that National Realty understood that Ambrosini was protesting gender discrimination. This was perhaps not surprising since, at the time of the motion, Ambrosini had not yet disclosed reliance on her alternative theory of retaliation.

In light of the lack of a trial motion addressed to the sufficiency of the evidence as to National Realty's understanding of the nature of Ambrosini's protests, we asked DeSalvo at oral argument of this appeal what additional evidence Ambrosini would have presented at trial had National Realty's sufficiency challenge prior to the submission of the case to the jury specified that issue. DeSalvo stated that Ambrosini's trial testimony had described fully the complaints made to Simon and Chiaro and that although Ambrosini might have gone into more detail as to the specific tasks she had been required to do, she had no additional evidence to present with respect to the complaints she had made. DeSalvo stated, "Based on the evidence before the jury, I cannot think that there would be more."

Since Ambrosini in her testimony had fully set forth her complaints to Simon and Chiaro, and since she had no additional evidence that she could have presented with respect to National Realty's understanding as to the nature of her protests, we conclude that National Realty's failure to specify the lack of proof as to that understanding as a basis for its Rule 50(a) motion did not result in any prejudice to Ambrosini.

### 3. Ambrosini's Failure To Articulate Her Alternative Theory

Finally, it is noteworthy that Ambrosini's alternative retaliation theory, i.e., that she was entitled to recover for retaliation even if the jury found no gender discrimination, was not revealed in the district court until after the jury had returned its verdict. Certainly the two jury interrogatories she proposed did not alert National Realty or the court to this possibility, for her proposed second question, which dealt with retaliation, assumed an affirmative answer to the first question, which asked whether there had been gender dis-

crimination. The questions were (1) "Do you find that National Realty discriminated against plaintiff on the basis of gender ...."; and (2) "Do you find that *thereafter* she was wrongfully terminated ... in retaliation...." (Emphasis added.) Nor did counsel make any mention of her alternative theory in response to comments of the trial judge that made it plain that he had not considered the possibility of a finding of unlawful retaliation without gender discrimination. For example, in connection with National Realty's Rule 50(a) motion, the court stated the view that Ambrosini's retaliation claim would succeed or fail on the same basis as the gender discrimination claim, and that the question was simply "whether you made a case in which a jury could infer that there was any gender discrimination excised [sic] in this situation. If the answer to that is no, then obviously all your claims fall." (Tr. 610.) Ambrosini's counsel did not dispute this view of the law. She made no request that the district court instruct the jury that it could return a verdict in her favor on the retaliation claim even if it found no gender discrimination. And although she voiced some objections to the district court's proposed jury charge, she did not make any objection on the ground that her alternative theory was not mentioned.

In the ordinary case, such proceedings would normally lead us to conclude that the alternative theory of retaliation had been waived. However, in this case, given the lack of any instructions to the jury as to the elements of a retaliation claim on any theory, a finding of waiver would perhaps be inappropriate. Nonetheless, Ambrosini's failure to mention the alternative theory prior to the submission of the case to the jury is not irrelevant to our assessment of whether we should, in the interests of justice, reach the merits of National Realty's present sufficiency challenge to that claim notwithstanding the fact that its Rule 50(a) motion was flawed. We conclude in all the circumstances of this case, including the nature of the instructions, the belatedness of Ambrosini's disclosure of her reliance on the alternative theory, and the acknowledgement by Ambrosini that she had no additional evidence to

present as to what she said to Simon or Chiaro in protesting her working conditions, that we will reach the merits of the present sufficiency challenge to the alternative theory in the interests of justice.

B. *The Sufficiency of the Evidence of Gender Discrimination* ·

 The standard governing motions for judgment as a matter of law ("JMOL") pursuant to Rule 50, formerly denominated motions for directed verdict or motions for judgment notwithstanding the verdict, *see generally Piesco v. Koch*, 12 F.3d at 341; *Samuels v. Air Transport Local 504*, 992 F.2d at 14, is well established. Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor. *See, e.g., Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir.1992); *Vasbinder v. Ambach*, 926 F.2d 1333, 1339 (2d Cir.1991). In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, *id.*, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence, *id.* at 1340. Thus, judgment as a matter of law should not be granted unless

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Cruz v. Local Union No. 3*, 34 F.3d at 1154 (quoting *Bauer v. Raymark Industries, Inc.*, 849 F.2d 790, 792 (2d Cir.1988) (internal quotation marks omitted)). The same standards govern the court of appeals in its review of the decision of a motion for JMOL. *See, e.g., Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d at 1039; *Vasbinder v. Ambach*, 926 F.2d at 1339. Within this framework, we consider the propriety of JMOL in light of the substantive law.

 Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a). One form of gender discrimination prohibited by Title VII is sexual harassment that results in a "hostile or abusive work environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). To prevail on such a claim, the plaintiff must demonstrate, *inter alia*, that the gender-based conduct complained of was sufficiently severe or pervasive to create a hostile environment. *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Although the harassment need not take the form of sexual advances or other explicitly sexual conduct in order to be actionable under Title VII, *see, e.g., McKinney v. Dole*, 765 F.2d 1129, 1138 (D.C.Cir.1985), the plaintiff is required to establish that the harassment complained of was based on her gender, *see, e.g., Meritor Savings Bank, FSB v. Vinson*, 477 U.S. at 63–66, 106 S.Ct. at 2403–05; *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir.1993). In order to show that the allegedly harassing conduct was motivated by gender, or that "gender played a motivating part in an employment decision," a female plaintiff must show that one of the reasons for the harassment or the decision was that she "was a woman." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250, 109 S.Ct. 1775, 1790–91, 104 L.Ed.2d 268 (1989) (plurality opinion) (discussing disparate treatment).

 Evidence of sexual stereotyping may provide proof that an employment decision or an abusive environment was based on gender. *See, e.g., Price Waterhouse*, 490 U.S. at 250–51, 109 S.Ct. at 1790–91; *Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir.1991) (sex-stereotyping comments suggested that employer made hiring decision on the basis of stereotypical images of men and women); *Sheehan v. Purolator, Inc.*, 839 F.2d 99, 106–07 (2d Cir.) (Kearse, J., dissenting), *cert. denied*, 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988). In *Price Waterhouse*, the Supreme Court considered an employer's

decision not to promote a female employee in reliance on partners' evaluations that the plaintiff was too "aggressive." The Court upheld the trial court's finding that that characterization "showed sex stereotyping" in operation. 490 U.S. at 251, 109 S.Ct. at 1791. It stated that "[i]n the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman" cannot properly have a certain characteristic "has acted on the basis of gender." *Id.* at 250, 109 S.Ct. at 1790–91. The Court stated that

> we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for [i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

*Id.* at 251, 109 S.Ct. at 1791 (internal quotation marks omitted). The Court also noted, however, that

> [r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. *The plaintiff must show that the employer actually relied on her gender in making its decision.*

*Id.* (emphasis added). In keeping with this requirement, this Court has upheld the dismissal of a Title VII complaint for failure to state a claim where a female employee alleged gender discrimination on the basis that the promotions she sought were given to more attractive women, but did not allege that men were not also subject to attractiveness criteria in determining promotions and did not allege that she had ever been in competition with a male. *See Malarkey v. Texaco, Inc.*, 704 F.2d 674, 674–75 (2d Cir. 1983) (per curiam).

■ In the present case, accepting all of the evidence presented by Ambrosini as true, and drawing all reasonable inferences in her favor, we conclude that the events she described were insufficient to permit an inference that either her working conditions or the decision to discharge her were based in any way on her gender. Her principal complaint was that she was required to perform work related to Simon's personal matters. According to Ambrosini, gender discrimination was implicated by "the nature of the[ ] particular tasks" that Simon gave her. (Tr. 644.) But virtually every task of which she complains was quintessential secretarial work: typing, copying, faxing, scheduling appointments, locating addresses or telephone numbers, handling telephone calls, and arranging for pick-ups and delivery. Evidence that a female secretary has been required to perform such services as typing her employer's personal letters or making appointments for him with the cable installer, in the absence of evidence that could permit an inference that gender played a role in those work assignments, is insufficient to permit a finding of gender bias.

Here there was no evidence whatever that Simon, in making those assignments, gave any consideration to Ambrosini's gender. Ambrosini did not describe a single statement by Simon that could even remotely be construed as reflecting any consideration of her gender. For example, when Ambrosini first complained to Simon about working on his personal matters, "he didn't say anything" (Tr. 154); he merely continued to give her such assignments. When Ambrosini complained to him the second time, he did respond, but his response in no way suggested any view that these tasks were "women's work." According to Ambrosini's testimony, Simon's response was simply that *"he* couldn't do it" (Tr. 152 (emphasis added)), because *"he* didn't have the *time* to do it." (Tr. 153 (emphasis added).)

In sum, the tasks whose nature Ambrosini argued showed sexual stereotyping were tasks of a kind typically done for an executive by his or her secretary, whether the secretary is female or male. It may be that historically, in most firms, most secretaries have been women. But proof that an employer has assigned to a secretary tasks that are traditionally secretarial tasks—even if related to the employer's personal business—does not suffice to support a verdict of gender discrimination under Title VII.

Ambrosini's contention that gender discrimination could be found because she was treated less favorably than certain of her co-

workers fares no better. She was not entitled to prevail on the basis of her evidence that Simon assigned his personal tasks to her rather than to the two male employees, Brudner and Headley, for the three did not occupy similar positions. Whereas Ambrosini was a secretary, the men were not. Ambrosini's responsibilities included such tasks as taking dictation, typing, filing, and answering the telephones; the men's jobs were professional rather than clerical, involving travel, examination of real properties, and acquisition of real estate sites. Given their quite different positions, no rational inference of disparate treatment on the basis of gender could be drawn from evidence that Brudner and Headley were not given the secretarial-type tasks assigned to Ambrosini.

Nor was there evidence to support Ambrosini's contention that she was the victim of unlawful discrimination because of the more favorable treatment received by Cinque and Olivieri, who held positions more comparable to Ambrosini's, and who, she argued, "conformed to a sexual stereotype where [she] did not" (Tr. 581). The gist of this contention is reflected in Ambrosini's argument that

> [t]he jurors may infer that because Dana [Cinque] looked a certain way, acted a certain way, made Mr. Simon's life more pleasant in the workplace, even if it was something as simple as bringing him coffee, she conformed to the sexual stereotype and she did not complain about it.

(Tr. 588.) But Ambrosini's evidence that she was required to work harder than her two female co-workers cannot reasonably be connected to her gender. We know of no provision of Title VII, nor any regulation or case construing that statute, that imposes liability on an employer for preferring an employee who chose to "ma[k]e [an executive's] life more pleasant in the workplace, even if it was something as simple as bringing him coffee."

Further, assuming *arguendo* that requiring a secretary to bring coffee and clear the desk of used coffee cups would constitute gender discrimination, we have not seen, despite Ambrosini's counsel's repeated references to coffee-related tasks, any evidence of

such a requirement. According to Ambrosini, Cinque brought Simon coffee "unsolicited" (Tr. 587) and removed the used cups "voluntarily" (Tr. 634). As to Ambrosini herself, the evidence was entirely insufficient to show anything even approaching the severity or pervasiveness necessary to prove a hostile work environment. Ambrosini, who worked at National Realty for a year, testified that Simon asked her to remove a used coffee cup from his desk "one time." (Tr. 150.) When her counsel asked "Did Mr. Simon ever ask you to get him coffee regularly?", Ambrosini responded "No." (*Id.*)

We note also that Ambrosini argues here, as she did in the district court, that she was required to cater to Simon's "personal and emotional needs." Our review of the record does not reveal any evidence of demands by Simon other than those to which Ambrosini testified as described in Part I.A. above, and that testimony reveals no evidence of any demands for emotional succor.

In sum, although Ambrosini complains that she was required to do work for Simon on his personal matters, virtually every such task was quintessentially secretarial work; although she complains that the two men were not required to do such work, neither of the men was a secretary; and although she complains that she was treated less favorably than two employees who held positions comparable to her secretarial position, both of those employees were women. There was no evidence that Ambrosini was treated differently because of her gender.

Accordingly, we agree with the district court that the evidence was insufficient as a matter of law to support the claim that Ambrosini was a victim of discrimination on the basis of her gender.

### C. *The Sufficiency of the Evidence of Prohibited Retaliation*

 Title VII also provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a). The "objective of this section

is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d at 593. To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996). With respect to the first element, participation in protected activity, the plaintiff need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a "good faith, reasonable belief that the underlying employment practice was unlawful" under that statute. *Id.* (internal quotation marks omitted); *see also Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d at 593. The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances. *Reed v. A.W. Lawrence & Co.*, 95 F.3d at 1178. As to the second element, implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.

■ In the present case, assuming that Ambrosini genuinely believed herself to be the victim of discrimination on the basis of her gender at the time she made her protests, we conclude that the evidence was insufficient to support her claim of retaliation in two respects. First, for the reasons discussed in the preceding section, there was no semblance of gender-oriented motivation in the events or conversations to which Ambrosini testified. Given the fact that the co-workers she believed were treated more favorably were either women or executives, and given that virtually all of the tasks she was assigned are tasks that are normally performed by secretaries, there was no basis for a rational finding that Ambrosini's belief

that she was being discriminated against because she was a woman—even if genuine—was reasonable.

Second, Ambrosini's complaints to Simon and Chiaro did not state that Ambrosini viewed Simon's actions as based on her gender, and there was nothing in her protests that could reasonably have led National Realty to understand that that was the nature of her objections. Her testimony as to the objections she made is described in Part I.A. above, and none of it suggested any complaint of gender discrimination. For example, she complained to Simon and/or Chiaro that Cinque and Olivieri were slackers; but it would have been peculiar to interpret that criticism as a complaint that Ambrosini was being discriminated against because she was a woman, given that Cinque and Olivieri were women. Further, when Ambrosini complained to Simon and Chiaro about having to do work on Simon's personal matters, she merely said she found herself in a conflict because she was supposed to be doing work for the company, and she asked what the company policy was. Not one of her complaints to Simon or Chiaro adverted to gender as a basis for Simon's assignments. Nor was there evidence that, when told she would have to continue doing as Simon instructed, Ambrosini protested that the requirement was gender-based.

In sum, Ambrosini's complaints to National Realty in no way intimated that she believed Simon's conduct to be influenced by her gender, and hence there was no evidence to support a finding that National Realty discharged her in retaliation for opposing Title VII-prohibited discrimination.

### CONCLUSION

We have considered all of Ambrosini's arguments on this appeal and have found in them no basis for reversal. The judgment of the district court dismissing the complaint as a matter of law is affirmed.