Jason C. WELDY, Plaintiff–Appellant,

v.

PIEDMONT AIRLINES, INC., Defendant–Appellee.

No. 126, Docket 92–7427.

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1992.

Decided Jan. 28, 1993.

William A. Price, Buffalo, NY, for plaintiff-appellant.

W.T. Cranfill, Jr., Charlotte, NC (Blakeney & Alexander; Phillips, Lytle, Hitchcock, Blaine & Huber, Michael R. Moravec, Joseph J. Welter, of counsel), for defendant-appellee.

Before: KEARSE, PRATT, and McLAUGHLIN, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Plaintiff Jason C. Weldy appeals from that part of a judgment of the United States District Court of the Western District of New York, John T. Elvin, *Judge*, that dismissed his slander claim against defendant Piedmont Airlines. After the plaintiff had presented his case to the jury, the district court granted Piedmont's motion under Fed.R.Civ.P. 50 for judgment as a matter of law, on the ground that Weldy had not met his burden of proving his claim either for slander or for compelled self-defamation.

On appeal Weldy challenges only the dismissal of his slander claim. He argues that he produced sufficient evidence to establish a *prima facie* case of slander under New York law, and that dismissal of that claim before Piedmont had presented its evidence was improper. Agreeing with Weldy, we reverse and remand for a new trial on the slander cause of action.

## BACKGROUND

### A. *Standard of Review*

Fed.R.Civ.P. 50(a)(1) reads:

If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim, counterclaim, cross-claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue.

The general approach to applying this rule has been concisely summarized in Wright & Miller:

Whether the evidence is sufficient to create an issue of fact for the jury is solely a question of law to be determined by the court. The standard in passing on that question is the same whether it arises in the procedural context of a motion for directed verdict or of a motion for judgment notwithstanding the verdict. It is the same in the trial court and on appeal.

Since grant of one of these motions deprives the party of a determination of the facts by a jury, they should be cautiously and sparingly granted * * *.

In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence.

9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2524, at 541–45 (1971) (citations omitted).

In our circuit, the district court may grant the motion "only when, viewing

the evidence most favorably to the party other than the movant, 'there can be but one conclusion as to the verdict that reasonable men could have reached.' " *Diebold v. Moore McCormack Bulk Transp. Lines, Inc.*, 805 F.2d 55, 57 (2d Cir.1986) (quoting *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167 (2d Cir.1980)). The nonmovant must be given the benefit of all reasonable inferences, because the trial court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Mattivi*, 618 F.2d at 167.

### B. *Facts the Jury Could Have Found*

Applying this standard, we must assume the truth of Weldy's evidence and grant him every reasonable inference. This means that the jury could have found the following facts.

This case arises out of an incident involving Weldy and his co-worker, Tracey George, that resulted in both being discharged from employment at Piedmont Airlines. Weldy, his wife Wendy Weldy, and George were all employed as station agents at Piedmont's terminal facility in the Greater Buffalo International Airport. In July 1987 Wendy Weldy began an extramarital affair with George, but ended it in October 1987, when she reconciled with Weldy.

Perhaps out of frustration at Wendy's decision to end their romance, George slashed the tires of her car on November 8, 1987. When, on the next day, George also pushed and threatened her at the Piedmont Terminal, Wendy immediately called her husband at home to tell him what George had done.

Several hours later, Weldy entered the terminal to confront George for harassing his wife. He appeared very angry and in a loud voice told George that he "wanted the money for the tires and I told him to leave Wendy alone."

Supervisor Patrick Kirwan, who was aware of both the extramarital affair and the tire-slashing incident, recognized there was a potential for violence, so he moved in front of Weldy, who simply stopped. Weldy did not push Kirwan or resist him in any way. At the same time, another employee, Michael Wilkins, approached George and stood in front of him. However, there was no need to restrain either Weldy or George, because there was no physical contact between them during the incident, nor were any verbal or physical threats made. Weldy then apologized to Kirwan and quietly left the terminal.

Nearly two weeks later, on November 20, 1987, Charles Hathaway, the Piedmont station manager, in the presence of another Piedmont employee, Leslie Price, told Weldy that he was being fired because of "aggravated assault" on George. A short while later, Hathaway confirmed to supervisor Robert Burdzy that he had discharged Weldy because of the "aggravated assault". These statements are the focus of Weldy's slander claim.

Hathaway, however, had no direct knowledge of the Weldy/George incident, because he was on vacation the day it occurred. Upon returning to work he discussed the incident with several people, including the only two eyewitnesses who had seen the entire event, Kirwan and Wilkins, both of whom told Hathaway that Weldy neither threatened George nor hit him.

Wilkins, a former policeman, told Hathaway that "they didn't swing at each other or have a fight". After Hathaway persisted that others had advised him that there had been a fight, Wilkins stated, "[A]fter being a policeman all those years, I know what a fight is and what [a fight] isn't".

There was also evidence from which the jury could have inferred that Hathaway had an ulterior improper motive for magnifying the circumstances surrounding the Weldy/George incident. Hathaway held a grudge against another employee, Peter Tripodi, and despite Tripodi's previously pristine work record, Hathaway had begun, in late October 1987, to document in Tripodi's personnel file minor violations of company policy. Since Tripodi, a Piedmont customer service manager, had been in charge of operations the day the Weldy/George

incident occurred and had prepared no report either of the Weldy/George incident, or of the earlier tire slashing of Wendy Weldy's car, Hathaway saw this as an opportunity to get Tripodi discharged. The more "dangerous" the incident could be made to appear, the more serious would be Tripodi's failure to have reported it.

A jury could find, however, that Tripodi had permissibly made a discretionary decision not to report the incident. He testified that he "didn't see where anything had happened [during the confrontation] that required documentation in an employee's file," and that he did not report the tire slashing, because Hathaway's own policy had treated the employees' parking lot, where it occurred, as beyond the company's jurisdiction.

Hathaway's plan worked, however, when on November 17, 1987, Tripodi was suspended on the ground that he had "intentionally concealed from the company * * * attempted aggravated assault". Tripodi later chose termination over a transfer.

On November 20, 1987, Piedmont discharged Weldy because of, as Hathaway told him in the presence of another employee, his "aggravated assault" on George.

### C. *Proceedings Below*

Weldy brought his action in the Supreme Court of the State of New York, County of Erie, alleging among other things, slander. Piedmont removed the action to the Western District of New York. The gravamen of Weldy's slander claim is that Hathaway's statement that Weldy had committed an "aggravated assault" was slanderous *per se*, because it falsely imputed an indictable offense to him.

At the end of Weldy's side of the case, the district judge granted Piedmont's rule 50 motion and dismissed the complaint. His entire explanation for dismissing the case was that "the plaintiff has not met his burden of proof with respect to his claims of slander and compelled self-defamation, and that the defendant is entitled to judgment as a matter of law".

The district judge did not indicate on which element or elements of his claims Weldy had fallen short. Piedmont had argued (1) that the charge of "aggravated assault" was true, but that (2) even if it were false Piedmont was protected by a qualified privilege (3) that it had not abused. Piedmont also had argued that (4) an accusation of "aggravated assault" was not "slander *per se*", and that Weldy had presented insufficient evidence of damage, which is a required element of a claim for "slander *per quod*", although not for "slander *per se*".

Because of the differing and shifting burdens of proof on the interacting issues in a slander action that involves a claim of qualified privilege, some indication from the district judge as to the specific failings in Weldy's case would have greatly facilitated our review on appeal. Indeed, because of the failure of the district judge's decision to explain why he dismissed the complaint, we could simply remand for further explanation, without addressing at this time the merits of the appeal. *Super X Drugs Corp. v. Federal Deposit Ins. Corp.*, 862 F.2d 1252, 1256 (6th Cir.1988). Under the circumstances of this appeal, however, where Weldy has abandoned his claims of compelled self-defamation and slander *per quod*, and challenges only the dismissal of his slander *per se* claim, it is clear that on every possible basis for dismissal of this slander claim the district judge erred. In short, the evidence before the jury, viewed as it must be from plaintiff's perspective, was sufficient to require denial of Piedmont's rule 50 motion as to Weldy's slander *per se* claim.

### D. *New York Law of Slander*

In this diversity action, plaintiff's slander claim is, of course, governed by substantive New York tort law. *Chrysler Capital Realty, Inc. v. Grella*, 942 F.2d 160, 162 (2d Cir.1991). There are, generally speaking, four elements necessary to establish a *prima facie* case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. *See* 2 *NY PJI* 104–05 (Supp.1991). The fourth element is pre-

sumed when the defamatory statement takes the form of slander *per se, Liberman v. Gelstein,* 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 860–861, 605 N.E.2d 344, 347, 348 (N.Y., 1992), one form of which is a statement that charges the defamed person with an "indictable offense upon conviction of which punishment may be inflicted", *Privitera v. Town of Phelps,* 79 A.D.2d 1, 3, 435 N.Y.S.2d 402, 404 (4th Dept.1981), or with a "serious crime". *Liberman,* 80 N.Y.2d at 435, 590 N.Y.S.2d at 860, 605 N.E.2d at 437.

■ Assault is a crime under both state and federal law. Under New York law, most assaults are felonies, *see* N.Y. Penal Law §§ 120.03 (Vehicular assault in the second degree), 120.04 (Vehicular assault in the first degree), 120.05 (Assault in the second degree), 120.10 (Assault in the first degree), and 120.11 (Aggravated assault upon a police officer or a peace officer) (McKinney 1992); at least one is a misdemeanor. *Id.* at § 120.00 (Assault in the third degree). In New York, however, both felonies and misdemeanors are "indictable offenses", which New York's Appellate Division tells us, may form the basis for slander *per se. Privitera,* 79 A.D.2d at 3, 435 N.Y.S.2d at 404. Under federal law, there are at least three statutes, under which assault can be a felony, and therefore an indictable offense. 18 U.S.C.A. §§ 111–113 (West Supp.1992).

■ In short, since assault is a serious, indictable crime under both state and federal law, Hathaway's charge of "aggravated assault" provided a sufficient basis for holding Piedmont liable under a slander *per se* cause of action.

■ New York permits, however, a defense of qualified privilege against an otherwise meritorious claim of slander.
> [A] communication made by a person with an interest or duty to make the communication and sent to a person with a corresponding interest or duty is protected by a qualified privilege, even though without the privilege the communication would be "slanderous and actionable."

*Olivieri v. McDonald's Corp.,* 678 F.Supp. 996, 1001 (E.D.N.Y.1988) (citing *Byam v. Collins,* 111 N.Y. 143, 150, 19 N.E. 75 (1888)); *see also Shapiro v. Health Ins. Plan of Greater N.Y.,* 7 N.Y.2d 56, 60, 194 N.Y.S.2d 509, 512–13, 163 N.E.2d 333, 335–36 (1959). Once the defendant has proved that it is entitled to a qualified privilege, there arises a rebuttable presumption of good faith that may constitute a complete defense.

■ In order to defeat this rebuttable presumption, the plaintiff must demonstrate two things: (1) that the statement was false, *Stukuls v. State,* 42 N.Y.2d 272, 279, 397 N.Y.S.2d 740, 745, 366 N.E.2d 829, 833–34 (1977), and (2) that the defendant abused its qualified privilege. *Liberman,* 80 N.Y.2d at 437, 590 N.Y.S.2d at 862, 605 N.E.2d 344, 349.

■ A plaintiff may demonstrate abuse of the privilege by proving that the defendant acted (1) with common law malice, *id.,* or (2) outside the scope of the privilege, *see Harris v. Hirsh,* 161 A.D.2d 452, 454, 555 N.Y.S.2d 735, 737 (1st Dept.1990), or (3) with knowledge that the statement was false or with a reckless disregard as to its truth. *Liberman,* 80 N.Y.2d at 437–438, 590 N.Y.S.2d at 862, 605 N.E.2d at 349; *Loughry v. Lincoln First Bank, N.A.,* 67 N.Y.2d 369, 376, 502 N.Y.S.2d 965, 968, 494 N.E.2d 70, 73 (1986).

■ Thus, while a qualified privilege may be invoked when a defendant's acts were for a proper purpose and exercised in a reasonable manner, it is nevertheless, " 'forfeited if the defendant steps outside of the scope of the privilege or abuses the occasion.' " *Harris,* 161 A.D.2d at 453, 555 N.Y.S.2d at 737 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 115, at 832 (5th ed. 1984)). Moreover, a defendant exceeds the scope of the privilege if the defamatory statement is made "in furtherance of an improper purpose". *Id.*

■ Recognizing this posture of New York law, Weldy concedes on this appeal that Hathaway's communications to him and to Piedmont's managers of the reason

for his discharge—"aggravated assault"— were protected by a qualified privilege; however, he argues, Piedmont lost the privilege (1) because the statements were false, and (2) because Hathaway abused its privilege, by acting with malice, outside the scope of the privilege, and with a reckless disregard as to the truth of the statements.

### 1. *Falsity*

Plaintiff presented evidence that the statement was false and that Hathaway knew it, or at a bare minimum, that Hathaway demonstrated a reckless disregard for its truth. In a written report describing the Weldy/George incident, supervisor Kirwan advised Hathaway that "[myself] and Michael Wilkins got in between the two of them before anything happened * * * Jason at that time calmed down and apologized for his actions, and left." Nothing in this report suggests the appropriateness of a charge of "aggravated assault".

Nor was there anything in Wilkins' testimony that would suggest an "aggravated assault". Wilkins told Hathaway that Weldy had made no physical contact with, nor threat against, George. Wilkins testified that "they didn't swing at each other or have a fight of any means." He also testified that Hathaway had claimed that Wilkins "was possibly minimizing the situation." When asked whether it was possible that Hathaway was trying to get him to exaggerate the danger of the incident, so as to magnify Tripodi's failure to advise Piedmont, Wilkins responded affirmatively. Thus, since the only impartial eyewitnesses to the complete incident, Kirwan and Wilkins, had advised Hathaway that Weldy was not violent and had not threatened George, there was sufficient evidence in the record for the jury to infer both that the defamatory statement was false and that Hathaway either knew it was false or that he spoke with a reckless disregard for its truth.

### 2. *Abuse of Qualified Privilege*
#### a. *Evidence of Abuse*

■ As we have seen, one way for a defendant to abuse and thereby lose its

qualified privilege is to act with "malice". Under New York law, there are two standards that govern the proof of malice: the *New York Times* first-amendment malice standard, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), and the common-law malice standard, which may include an improper purpose and reckless disregard for the truth. *Liberman*, 80 N.Y.2d at 437–438, 590 N.Y.S.2d at 862, 605 N.E.2d at 349.

Weldy contends that the applicable standard of proof on the issue of malice is preponderance of the evidence. Piedmont argues that the court should apply the standard required in first-amendment cases, clear-and-convincing evidence.

Regardless of which standard of proof is applied to the issue of malice, however, there was sufficient evidence in this record for the jury to have concluded that the defendant abused its qualified privilege. Weldy's evidence, discussed above, that Hathaway acted at least with a reckless disregard to the truth of his statement, would, if accepted by the jury, defeat the qualified privilege. *Loughry*, 67 N.Y.2d at 376, 502 N.Y.S.2d at 968, 494 N.E.2d at 73.

The jury could also have found an abuse of the privilege by determining that Hathaway had an improper purpose, in that he was deliberately exaggerating the extent of the danger involved in the Weldy/George incident so as to use Tripodi's failure to report the incident as a device to force Tripodi's discharge.

Thus, it is apparent that the judgment must be reversed and a new trial ordered on the slander claim. Because the issue of standard of proof may arise on the retrial, we will address that issue for the guidance of the parties and the district court.

#### b. *Standard of Proof for Malice*

■ Although in most civil cases, a preponderance-of-the-evidence standard is sufficient, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252–53, 109 S.Ct. 1775, 1791–93, 104 L.Ed.2d 268 (1989); *In re Storar*, 52 N.Y.2d 363, 379, 438 N.Y.S.2d 266, 274, 420

N.E.2d 64, 72–73, *cert. denied,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981), a clear-and-convincing standard for proving malice has been applied in some defamation cases, but only in the context of constitutional issues arising under the first amendment, where there is an important public interest in protecting freedom of expression. *New York Times Co.,* 376 U.S. at 285–86, 84 S.Ct. at 728–29 (malice must be proved with "convincing clarity"); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (held that *New York Times Co.* reference to proof by "convincing clarity" means proof by "clear-and-convincing" evidence).

 Which standard of proof to use in a particular defamation case varies with (a) the status of the plaintiff as a public or private figure, and (b) whether the subject of the speech is a matter of public or private concern. Thus, there are four possibilities: (1) public person/public matter, (2) private person/public matter, (3) public person/private matter, and (4) private person/private matter. This appeal involves a private person (Weldy) in a private matter (discharge from private employment).

 The Supreme Court has already established the law for three of these possibilities. When the issue is one of a public person, regardless of whether it is a public or private matter, the clear-and-convincing standard must be used. *See New York Times Co.,* 376 U.S. at 285–86, 84 S.Ct. at 728–29; *see also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155–56, 87 S.Ct. 1975, 1991–92, 18 L.Ed.2d 1094 (1967) (*New York Times Co.* standard applies to public figures). With a private person/public matter defamation, the Supreme Court has held that "the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 346, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). Applying that principle, the New York Court of Appeals held in *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64, 341

N.E.2d 569, 571 (1975), that the plaintiff must establish that the defendant acted in a grossly irresponsible manner. Significantly, however, the court held that the "grossly irresponsible manner" must be established by a preponderance of the evidence. The precise holding of the court was:

> We now hold that within the limits imposed by the Supreme Court where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, *by a preponderance of the evidence,* that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

*Chapadeau,* 38 N.Y.2d at 199, 379 N.Y.S.2d at 64, 341 N.E.2d at 571 (emphasis added).

Although our review of New York law reveals no case in which the Court of Appeals has addressed the standard of proof for this case, which involves the fourth possibility, a private person/private matter, we cannot imagine that New York would afford greater protection to private person/private matter statements, where first-amendment considerations are not implicated at all, than it did to the private person/public matter statements in *Chapadeau,* where there was, at least, some public interest involved.

One New York lower court in a private person/private matter statement has held that the clear-and-convincing standard should be used to prove malice. *Murphy v. Herfort,* 140 A.D.2d 415, 417, 528 N.Y.S.2d 117, 119 (2d Dept.1988). That court, however, did not address the public/private distinction, and the only authority it cited in support of applying the enhanced evidentiary standard was a public person/public matter situation that constitutionally required use of the clear-and-convincing standard. *Simmons Ford, Inc. v. Consumers Union of United States,* 516 F.Supp. 742,

746–47 (S.D.N.Y.1981). We therefore do not regard *Murphy* as a reliable indicator of the course of New York law.

Finally, we find no support for applying the clear-and-convincing standard in the New York Constitution, in the common law, or in the first-amendment cases that deal with defamation. We conclude, therefore, that New York courts would apply the preponderance-of-the-evidence standard for proving malice in this case, which involves a private person and a private matter.

## CONCLUSION

The district court erred in granting judgment as a matter of law pursuant to Fed. R.Civ.P. 50. The judgment is therefore reversed, and the case is remanded for a new trial on the slander cause of action.