**Phyllis MELOFF, Plaintiff–Appellant,**

v.

**NEW YORK LIFE INSURANCE COMPANY, Defendant–Appellee.**

**No. 99–9033.**

United States Court of Appeals, Second Circuit.

Argued April 18, 2000.

Decided Feb. 14, 2001.

Debra L. Raskin (Vladeck, Waldman, Elias & Engelhard, P.C.), New York, NY, for plaintiff-appellant.

Christopher M. Mason (Nixon Peabody LLP), New York, NY, for defendant-appellee.

Before WALKER, Chief Judge, POOLER and SOTOMAYOR, Circuit Judges.[1]

POOLER, Circuit Judge:

After 27 years as an employee of New York Life Insurance Company ("New York Life"), Phyllis Meloff lost her job for billing seven months of personal commuting expenses to the company's American Express card and failing to reimburse the company. Her supervisor sent an electronic message ("e-mail"), eventually forwarded to 16 employees, stating Meloff was fired for defrauding the company. She sued, alleging sex discrimination, re-

---

1. Ellsworth A. Van Graafeiland was originally a member of the panel, but could not partici- pate. Chief Judge John M. Walker, Jr. joined the panel after argument.

taliation and defamation.[2] The district court granted defendant's motion for summary judgment by order on October 15, 1993. This court vacated and remanded for further discovery. *See Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375–76 (2d Cir.1995). In September 1998, Judge Duffy granted defendant's motion for summary judgment as to Meloff's sex discrimination claim. A jury trial in April 1999 resolved the remaining two claims. The jury found New York Life did not retaliate against Meloff but awarded her $250,000 in compensatory damages and $1 million in punitive damages on her defamation claim. On August 4, 1999, the district court overturned the jury's verdict and granted defendant judgment as a matter of law. The court denied Meloff's conditional motion for retrial of the retaliation claim, but conditionally granted New York Life a new trial on defamation in the event of a reversal. This appeal followed. For the reasons stated below, we vacate the district court's grant of judgment as a matter of law, affirm its grant of a new trial on the defamation claim, affirm its denial of a retrial of the retaliation claim and remand for further proceedings.

## BACKGROUND

When reviewing a grant of judgment as a matter of law, we are obliged to take the evidence in the light most favorable to the party opposing the motion, and must defer to the jury's assessment of the evidence and the reasonable inferences drawn from it. *See Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998). Our recitation thus states the facts in the light most favorable to plaintiff, and is drawn in relevant part from the evidence heard by the jury.

Meloff began her employment as a clerk typist in New York Life's Philadelphia office in 1965, and received periodic promotions over the years. She transferred to the New York office in 1985 and became a staff assistant in the central services office. In 1986, she was promoted to administrative assistant, a position later reclassified as staff consultant, and then service consultant. Meloff did not receive another promotion after 1986. She continued to reside in Philadelphia and commuted to work in New York by train.

Meloff inquired in October 1990 about further promotional opportunities and learned from her supervisor, Frances Donnelly, about a service center pilot project. After receiving assurances from Jim Mellbye, a corporate vice president for that unit, that promotions were possible, she transferred in November 1990. Despite assuming supervisory duties, she was not promoted, and she became increasingly frustrated. At her annual evaluation in November 1991, at which she received a favorable review, she expressed her disappointment to John Begley, her immediate supervisor. Meloff told Begley men less qualified than she were receiving promotions and that sex discrimination was to blame. She testified that she told Begley men in her group "are being promoted every day for lesser skills and lesser accomplishments. I felt that I was being discriminated against with all the accomplishments that I had had." She named several men who she believed were promoted during the time she was not promoted, although she admitted on cross that the men she named always occupied higher positions than she did. Meloff told the jury she believed she was being discriminated against because:

> For the first time since I arrived at the home office I was now supervising a group of people. My job description clearly stated that there were no supervisory responsibilities and men with lesser skills and accomplishments were being promoted on a more regular basis and I was told that the last piece of my puzzle to attain my promotion from Mr. Begley and Mr. Mellbye would be to

2. Meloff brought her action under New York Human Rights Law, N.Y. Exec. Law § 290, the Administrative Code of the City of New York § 8–1–1, and New York common law.

make the Dallas Phone Center a success, and it was.

Begley explained to Meloff on December 5, 1991, that she would not receive a promotion because Mellbye did not think Meloff's position warranted one. Meloff told Begley she was being discriminated against and that she would talk to a lawyer. Meloff spoke with Mellbye on December 12, 1991, and she again complained of discrimination. Mellbye stated it was "customary" for him to report any complaints to his supervisor, Richard Koontz. Within the month, Koontz fired Meloff for misusing her corporate American Express card during a seven-month period when she charged her personal travel expenses without reimbursing the company.

Meloff received her corporate American Express card in April 1988 and signed a contract stating Meloff would "indemnify and hold harmless New York Life from any and all personal expenditures...." The New York Life personnel manual's corporate credit card section states, "[t]his card is to be used for business purposes only. Use of the card for personal expenditures is prohibited.... Misuse or abuse of the card may result in revocation of the card and disciplinary action." Meloff testified that she never saw this material, although she did consult the manual from time to time about other matters. On two occasions in late 1990 or early 1991, Meloff spoke with Barbara Fagnano, then an assistant vice president in consumer affairs, about charging personal trips. Meloff learned from Fagnano that she could obtain a credit memorandum from Alice Orisino[3], supervisor of the transportation department, and submit it along with a reimbursement check.

Beginning in January 1991, Meloff used the card to pay for her monthly Amtrak commuter ticket. Both personal and business travel expenses were centrally billed to New York Life, while other expenses were billed to the cardholder. Meloff reimbursed the company for her travel through March, and the company's treasury department accepted the reimbursement check and accompanying documentation. She continued to charge the company for her commuting expenses through December without making any reimbursement payments. Meloff blamed the oversight on a "heavy travel schedule" and illness in her family. She testified that she recognized her mistake and wrote a check for $3,600 before she went on vacation in late December. She left the check in her apartment. On January 6, 1992, she returned from vacation and went directly from the airport to work. She did not have the check with her.

When Meloff arrived at the office that morning, Larry Contello, a budget coordinator, confronted Meloff about her credit card charges and informed her that New York Life did not allow personal charges nor did it have a procedure for reimbursement. Meloff replied that she was unaware of any such restrictions. She obtained a reimbursement form from Orisino but was told that new company policy required a supervisor's signature. Meloff then spoke to Mellbye:

> I explained the whole situation of what had happened, that due to the heavy travel burdens and the onus of my family that I had been behind in my commuter pass payment and that I had a check that I wrote for $3600 and I wanted to present it to [Alice] Orisino to get the credit memorandum and I was told now because of a new procedure I had to get Mr. Mellbye to sign off on this credit memorandum.

Mellbye said he would have to check to make sure he had authority to sign, because the credit card came under a different budgeting department, but he also said, "no problem." Meloff received fur-

---

**3.** In briefs, depositions and trial transcripts, Orisino is referred to interchangeably as "Alex" or "Alice."

ther assurances that there were no problems when she met with Contello's boss, a corporate vice president:

The jury heard testimony from Jerry McCaffrey, New York Life's corporate vice president for human resources, regarding the treatment of another employee who misused his New York Life American Express. Mike Arbitman used his New York Life corporate card to pay for a variety of personal expenses, running up a bill in excess of $1,200 during 1990 and 1991. His card was canceled, but he suffered no other employment consequences as a result of the personal charges.[4] Koontz himself, who fired Meloff, admitted to charging some personal expenses on his corporate card, apparently without incident.

On January 10, 1992, Mellbye approached Meloff at the coffee cart and asked her to come to a meeting at his office at 11 a.m. When Meloff came to the meeting, she found Mellbye waiting with Koontz and Ellen Lindsey, director of Meloff's project. Koontz fired Meloff during that meeting. He told her, "I am sorry, Phyllis, you are being terminated for misuse of your corporate credit card." Meloff was shocked and upset he did not ask for her side of the story. Koontz simply gave Meloff a memorandum explaining she was fired for "gross misconduct," and he promptly left the meeting. Lindsay then walked Meloff down to her office, handed Meloff her coat and pocketbook, and escorted her out of the building into a waiting car. Meloff told the jury:

I was devastated, humiliated. I couldn't believe that this could possibly happen. How could someone be fired without the person who fired me even having the facts as to what took place. It just seemed absolutely incredible that something like this could happen to me. In all of my years at New York Life I

never remember anything like this ever happening to an employee.

Although New York Life's personnel manual requires a disciplinary memorandum to include the employee's explanation of events, Koontz did not give Meloff an opportunity to explain. Koontz conceded that a reprimand was an option for misuse of a corporate credit card. However, New York Life's guidelines allow for immediate termination of an employee for "theft or destruction of the Company's ... property."

Mellbye sent an e-mail with the subject heading "FRAUD" to Koontz and six New York Life managers who oversaw employees trained by Meloff.[5] The e-mail read:

WE FOUND IT NECESSARY TODAY TO TERMINATE PHYLLIS MELOFF, WHO USED HER CORPORATE AMERICAN EXPRESS CARD IN A WAY IN WHICH THE COMPANY WAS DEFRAUDED. PHYLISS [sic] HAD APPROX [sic] 27 YEARS WITH NEW YORK LIFE, AND WHOM WE CONSIDERED TO BE A VALUED ASSOCIATE. THIS ACTION REFLECTS OUR COMMITTMENT [sic] TO "ADHERE TO THE HIGHEST ETHICAL STANDARDS IN ALL OUR BUSINESS DEALINGS." I SEND THIS TO YOU FOR YOUR OWN INFORMATION.

Koontz received the e-mail and sent it on to four additional managers in the service center pilot project. One of those recipients forwarded the e-mail to five of his employees. Although he does not recall doing so, in the course of informing a group of approximately twenty employees that Meloff had been fired, Mellbye may have given credit card fraud as the reason. Meloff received phone calls from about twenty employees who learned she was fired for credit card fraud and some mentioned having received the e-mail.

---

4. Arbitman was eventually fired for taking money from New York Life using petty cash vouchers.

5. One of the e-mails reached the wrong employee because Mellbye mistyped the name.

## DISCUSSION

### Grant of judgment as a matter of law

■■■ We turn first to the question of whether the district court erred in granting New York Life judgment as a matter of law despite a jury finding of liability on the defamation claim. The standard for granting motions for judgment as a matter of law and for reviewing such grants on appeal are the same. See Galdieri–Ambrosini, 136 F.3d at 289. After a party presents its case, judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a). A court may, however, reserve decision on the legal issues presented until after a jury renders its verdict. See Fed.R.Civ.P. 50(b). Judgment as a matter of law is inappropriate unless:

(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

(2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

Galdieri–Ambrosini, 136 F.3d at 289 (citations omitted) (alterations in the original). Such motions "should be granted cautiously and sparingly." 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524, at 252 (1995). We must view the evidence in the light most favorable to the non-movant, deferring to the jury's assessment of the evidence and all reasonable inferences the jurors could draw from that evidence. See Galdieri–Ambrosini, 136 F.3d at 289. The court "may not itself weigh the credibility of witnesses or consider the weight of the evidence." Id.

■■■ The parties appear to agree New York law applies to Meloff's claims. New York requires a libel plaintiff to prove five elements: (1) a written defamatory statement of fact regarding the plaintiff; (2) published to a third party by the defendant; (3) defendant's fault, varying in degree depending on whether plaintiff is a private or public party; (4) falsity of the defamatory statement; and (5) injury to plaintiff. See Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 176 (2d Cir.2000); cf. Robert D. Sack, Libel, Slander and Related Problems § 2.1.1, at 2–1 to 2–3 (3d ed.2000) (setting forth elements of cause of action but questioning utility of broad statements since the tort has constitutional dimensions which vary considerably from case to case). Plaintiff's compensable injury is presumed if the defamatory statement falls within a category of libel per se. See Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 61–62 (2d Cir.1993) (citing Liberman v. Gelstein, 80 N.Y.2d 429, 590 N.Y.S.2d 857, 860–61, 605 N.E.2d 344, 347–48 (1992) (statements "charging plaintiff with a serious crime" or "that tend to injure another in his or her trade, business or profession" are slander per se)). A written statement that "charges a person with the commission of a crime" or "tends to disparage a person in the way of his office profession or trade" is libel per se. Zeevi v. Union Bank of Switz., 1993 WL 148871, at *4 (S.D.N.Y. 1993) (citations omitted). Applying that standard here, the allegation that Meloff defrauded New York Life is libel per se.

■■■ Qualified privilege is a defense to defamation, one which New York Life relies on here. See Weldy, 985 F.2d at 62. "New York common law affords qualified protection to defamatory communications made by one person to another upon a subject in which both have an interest." Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 98 (2d Cir.2000) (internal quotation marks and alteration omitted); see also Zeevi, 1993 WL 148871, at *6; Olivieri v. McDonald's Corp., 678 F.Supp. 996, 1001–02 (E.D.N.Y.1988); Byam v. Collins, 19 N.E. 75, 111 N.Y. 143, 150 (N.Y.1888).

The qualified privilege creates "a rebuttable presumption of good faith that may constitute a complete defense." *Weldy*, 985 F.2d at 62. This "common interest" privilege has been applied to communications within a firm concerning the actions of its employees. *Liberman*, 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344; *see also* Sack, *supra*, § 9.2.2, at 9–16 (observing that "in a broad sense the termination of a fellow employee may be considered a matter in which co-workers share a common interest."). As the allegations at issue arose in the context of employment, regarded an employee and were distributed only to other employees, New York Life successfully raised the rebuttable presumption of qualified privilege.

■■■ To rebut, Meloff must make two showings. First, she must prove the statement at issue was false. *See Weldy*, 985 F.2d at 62; *Schiffer v. Tarrytown Boat Club, Inc.*, 219 A.D.2d 704, 631 N.Y.S.2d 435, 437 (2d Dep't 1995) ("[T]ruth is an absolute defense to a libel action."). Even "substantial truth" will preclude a finding of libel. *See Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir.1986). Substantial truth turns on the understanding of the "average reader." *See id.* at 302–03; *Fleckenstein v. Friedman*, 193 N.E. 537, 538, 266 N.Y. 19, 23 (1934) ("A workable test is whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced.").

■■■ Second, as this case involved a private-figure plaintiff and a private matter, Meloff bore the burden of showing New York Life abused its privilege. *See Weldy*, 985 F.2d at 62. Thus, she must, by a preponderance of the evidence, show New York Life acted beyond the scope of the privilege, acted with common law malice or acted "with knowledge that the statement was false or with a reckless disregard as to its truth." *Id.* at 62, 65. Acting beyond the scope of the privilege means exercising the privilege in an unreasonable manner, abusing the occasion or

making the statement "in furtherance of an improper purpose." *Id.* at 62 (internal quotation marks omitted). Common law malice concerns a defendant's "spite or ill-will." *Konikoff*, 234 F.3d at 98 (internal quotation marks omitted). However, "[i]f the defendant's statements were made to further the interest protected by the privilege, it matters not that defendant also despised plaintiff. Thus, a triable issue is raised only if a jury could reasonably conclude that 'malice was the one and only cause for the publication.'" *Liberman*, 80 N.Y.2d at 439, 590 N.Y.S.2d 857, 605 N.E.2d at 350. Reckless disregard for the truth is also known as acting with malice in the constitutional sense. *See Konikoff*, 234 F.3d at 99. Constitutional malice requires either "a high degree of awareness of [the statement's] probable falsity" or "serious doubts as to [its] truth." *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (citations and internal quotation marks omitted).

■■■ We hold the district court erred in finding Meloff did not overcome the presumption of qualified privilege. Applying the strict standard of review, which forbids substituting our judgment for the jury's, we find no reason to overturn the jury finding that the accusation of fraud was not substantially true. As discussed above, the test for "substantial truth" asks what the understanding of the general reader would be. *See Guccione*, 800 F.2d at 302–03. Neither the district court nor this court is better qualified than the jury to decide the impression of the word "fraud" upon the average listener. What better group of "average listeners" than a panel of jurors, the proverbial jury of one's peers? As the standard of review requires us to credit the plaintiff with every possible inference a juror could draw, we uphold the jury's findings.

■■■ Similarly, we find the evidence, viewed in the light most favorable to plaintiff, supports a finding of constitu-

tional actual malice. Meloff spoke to her supervisor, Mellbye, when she learned there might be a problem with her charges, explained the situation, and gave him the check and her credit card. He reassured her, saying the charges were "no problem." Yet less than one week later, Mellbye sent an e-mail accusing Meloff of defrauding the company. The jury was entitled to find Mellbye seriously doubted Meloff committed fraud based on Meloff's testimony that when Mellbye heard her side of the story he reacted quite mildly. The jury heard testimony from Meloff· and Mellbye and could draw its own conclusions regarding the credibility of each. Further, the evidence presented to the jury showed Meloff had paid for prior transportation expenses using the card and reimbursed New York Life without incident, and that she had a check at the ready to pay for the expenses. The standard of review requires only that a reasonable juror could draw a conclusion from the evidence. It does not require that the juror draw the same conclusion the court might draw when looking at the same evidence. Since we find a reasonable juror could conclude the evidence supported a finding of constitutional actual malice, and actual malice defeats defendant's qualified privilege, we need not reach the question of common law malice.

Therefore, as the standard for review requires us to draw every reasonable inference in plaintiff's favor, we find sufficient evidence existed to support the jury findings that (1) the accusation of fraud was not substantially true and that (2) New York Life's actions reached the level of constitutional actual malice.

*Grant of a new trial*

■■■ We turn our attention to whether the district court erred in granting defendants a new trial on the defamation claim in the event this Court reversed its grant of judgment as a matter of law. We review a district court's decision to grant a new trial for abuse of discretion. *See Song v. Ives Labs. Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992). "[A] new trial may be granted even if there is substantial evidence to support the jury's verdict." *Id.* The district court is "free to weigh the evidence . . . and need not view it in the light most favorable to the verdict winner." *Id.* (internal quotation marks omitted).

■■■ We hold the district court did not abuse its discretion in awarding a new trial. Freed from the constraints of review that bind a court when deciding whether to grant judgment as a matter of law, the district court could examine the evidence through its own eyes. The evidence here showed Meloff did abuse the credit card in violation of company policy set forth in the employment manual. Her case depends upon an e-mail disseminated to a select group of employees, containing only the rather cautious (if not cautious enough) statement that she "used her corporate credit card in a way in which the company was defrauded." The evidence of constitutional malice was similarly attenuated. The allegations of malice turned on Meloff's controverted assertion that Mellbye originally said "no problem" only to accuse her of "fraud" a week later. To find constitutional malice in these circumstances, the finder of fact needed to (1) credit Meloff's testimony that Mellbye originally said "no problem"; (2) discredit Mellbye's testimony denying that statement; (3) credit Mellbye's alleged earlier statement as a true reflection of his position regarding Meloff's conduct; (4) conclude Mellbye did not change his mind in the week between the alleged "no problem" and writing the defamatory e-mail; and (5) discount Mellbye's testimony that when he sent the email, he believed Meloff's conduct to be "fraud." Again, under the more relaxed standards governing the grant of a new trial, the district court was free to examine the evidence through its own eyes and acted well within its discretion in granting a new trial on the defamation claim. As we affirm the district court's grant of a new trial on the defama-

tion issue, we need not reach the issue of damages.

*Retrial of the retaliation claim*

The district court correctly denied Meloff's motion for a retrial on her retaliation claim. Meloff argued the court erred by not informing the jury it could "consider whether Meloff's discharge occurred soon after her complaints of sex discrimination." A district court need not provide a charge "concerning every inference which might be drawn from the facts." *Fernandez v. Fitzgerald*, 711 F.2d 485, 487 (2d Cir.1983). It may exercise its discretion in deciding "what factual inferences best are left to argument of counsel and the common sense of the jury." *Id.* Meloff's counsel argued the point to the jury, and the jury clearly choose not to accept the theory.

Meloff also contended that the district court's instructions on pretext were erroneous. In reviewing the jury charge as a whole, *see Owen v. Thermatool Corp.*, 155 F.3d 137, 139 (2d Cir.1998), the court's pretext instruction did not mislead the jury as to the correct legal standard or fail to adequately inform the jury on the law. *See LNC Inv. Inc. v. First Fid. Bank*, 173 F.3d 454, 460 (2d Cir.1999). Meloff further argued that the district court erroneously excluded evidence of New York Life's treatment of another employee and of the uniqueness of the e-mail. We review evidentiary rulings under a deferential abuse of discretion standard and give district court judges "wide latitude in determining whether evidence is admissible at trial." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir.2000). The district court's evidentiary rulings were not an abuse of its discretion. We thus affirm the district court's denial of a retrial on the retaliation claim.

### Conclusion

For the reasons given above, we vacate the district court's judgment granting defendant judgment as a matter of law and affirm both the grant of a new trial on the defamation claim and denial of a retrial on the retaliation claim. Of course, Meloff's retaliation evidence is relevant evidence on the issue of New York Life's motivation on the defamation claim. We remand to the district court for proceedings consistent with this opinion.