Nancy GENOVESE, Plaintiff,

v.

COUNTY OF SUFFOLK and Robert Carlock, Defendants.

No. 10–CV–3470 JFB (AKT).

United States District Court, E.D. New York.

Signed Sept. 8, 2015.

---

Frederick K. Brewington, Ira F. Fogelgaren, North Hempstead Town Attorney's Office, Manhasset, NY, Myron Beldock, Beldock Levine & Hoffman, New York, NY, for Plaintiff.

Arlene S. Zwilling, Susan A. Flynn, Hauppauge, NY, for Defendants.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

This action arises from plaintiff Nancy Genovese's detention and arrest on July 30, 2009, outside Gabreski Airport. Plaintiff was originally detained after a Town of Southampton police officer observed plaintiff taking photographs of a military base. Upon approaching plaintiff, the police officer discovered that plaintiff was carrying a rifle case and ammunition in her vehicle. Plaintiff was subsequently arrested by Suffolk County Police Officers, charged with one count of criminal trespass, and detained for several days in the Suffolk County Correctional Center. The charges against plaintiff were dismissed on November 17, 2009.

Plaintiff commenced this action on July 29, 2010, asserting claims under 42 U.S.C. § 1983 and state law against the law enforcement officials and government entities involved in her arrest and detention.

This case was tried before a jury in December 2014. Although the original complaint in this action asserted a multitude of claims, the issues in this case were substantially winnowed by the time they were presented to the jury, and at present the lone remaining defendants in the case are Robert Carlock and the County of Suffolk. The claims submitted to the jury were as follows: a claim of malicious prosecution under federal and state law, a claim of retaliation under the First Amendment, and a claim of battery under state law.

On December 11, 2014, the jury reached a verdict, finding in favor of the plaintiff on her claim of malicious prosecution, and finding for the defendants on all other claims. The jury awarded plaintiff $1,112,000 in compensatory damages for her claim of malicious prosecution. However, the jury was unable to reach a ver-

dict on the issue of whether to award punitive damages against Carlock, and the Court declared a mistrial as to that claim. Plaintiff has requested a retrial on the issue of punitive damages.

Presently before the Court is the defendants' motion for judgment as a matter of law under Fed.R.Civ.P. 50(b). Defendants assert that they are entitled to judgment as a matter of law because: (1) the verdict was against the weight of the evidence; (2) plaintiff's claim fails because her prosecution did not terminate in her favor; and (3) Carlock is entitled to qualified immunity. In the alternative, defendants move, pursuant to Fed.R.Civ.P. 59, for a new trial or remittitur of the compensatory damages award, arguing that it is excessive.

For reasons set forth below, the motion for judgment as a matter of law is denied, and the motion for remittitur of damages is granted.

## I. MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. STANDARD OF REVIEW

The standard governing motions for judgment as a matter of law pursuant to Rule 50 is well-settled. A court may not properly grant judgment as a matter of law under Rule 50 against a party "unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor." *Arlio v. Lively,* 474 F.3d 46, 51 (2d Cir.2007) (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998)). Generally, a court reviewing such a motion must defer to all credibility determinations and reasonable inferences that the jury may have drawn at trial. *See Frank Sloup & Crabs Unltd., LLC v. Loeffler,* 745 F.Supp.2d 115, 120 (E.D.N.Y.2010). That is, a court considering a Rule 50 motion "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Meloff v. N.Y. Life Ins. Co.,* 240 F.3d 138, 145 (2d Cir.

2001) (quoting *Galdieri–Ambrosini,* 136 F.3d at 289); *see also Playtex Prods., Inc. v. Procter & Gamble Co.,* 02 Civ. 8046(WHP), 2004 WL 1658377, at *2, 2004 U.S. Dist. LEXIS 14084, at *5–6 (S.D.N.Y. July 26, 2004) ("A Rule 50(b) motion cannot be granted 'if, drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.'" (quoting *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1039 (2d Cir.1992))).

Thus, judgment as a matter of law is appropriately granted where "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Advance Pharm., Inc. v. United States,* 391 F.3d 377, 390 (2d Cir.2004) (alterations in original) (quoting *Galdieri–Ambrosini,* 136 F.3d at 289); *see also Kinneary v. City of N.Y.,* 601 F.3d 151, 155 (2d Cir.2010) (same); *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 142 (2d Cir.1998) (stating that a court assessing a Rule 50 motion must consider whether "the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [people] could have reached" (quoting *Cruz v. Local Union No. 3, Int'l Bd. of Elec. Workers,* 34 F.3d 1148, 1154–55 (2d Cir.1994))). In other words, this Court may only grant defendant's Rule 50(b) motion "if it cannot find sufficient evidence supporting the jury's verdict." *Playtex Products,* 2004 WL 1658377, at *2, 2004 U.S. Dist. LEXIS 14084, at *6; *see also Black v. Finantra Capital, Inc.,* 418 F.3d 203, 209 (2d Cir.2005) ("A court eval-

uating [ ] a motion [for judgment as a matter of law] cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury."). For this reason, a party moving to set aside a jury verdict must clear "a high bar." *Lavin–McEleney v. Marist College*, 239 F.3d 476, 479 (2d Cir.2001).

### B. DISCUSSION

The Court assumes familiarity with the underlying facts and procedural history of the case, which are set forth more fully in the Court's February 1, 2013 Memorandum and Order. The Court reserves recitation of the facts presented at trial for the discussion below.

Defendants challenge the jury's finding that Robert Carlock maliciously prosecuted plaintiff. Before addressing the merits of defendants' arguments, the contours of plaintiff's claim require some explanation.

Plaintiff initially asserted her claim of malicious prosecution against both Carlock and the County, under both Section 1983 and New York law. Before trial, the parties agreed to bifurcate all of plaintiff's Section 1983 claims against the County (which were asserted pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Thus, the malicious prosecution claims that proceeded to trial were state law claims of malicious prosecution against Carlock and the County, and a Section 1983 claim of malicious prosecution against Carlock alone. At trial, with the consent of the parties, the Court instructed the jury that the County would also be held liable by operation of state law if the jury found that Carlock had maliciously prosecuted plaintiff. Thus, the County's liability was predicated solely upon Carlock's liability under state law, and therefore the only issue for the jury to resolve was whether Carlock maliciously prosecuted plaintiff.

For that reason, the verdict sheet submitted to the jury read as follows: "Claim one: malicious prosecution under state and federal law. Did plaintiff prove, by a preponderance of the evidence, that Deputy Sheriff Carlock maliciously prosecuted her?" The jury answered that question in the affirmative.

■ After the verdict was announced, plaintiff's counsel informed the Court that plaintiff did not wish to pursue a *Monell* claim against the County in a separate trial, and thus that claim has been abandoned. Accordingly, the jury's verdict effectively found liability against Carlock for malicious prosecution under Section 1983 and state law, and vicarious liability against the County for malicious prosecution under state law. Ultimately, the distinction between state and federal claims of malicious prosecution does not affect the Court's analysis, because the elements of a malicious prosecution claim are identical under Section 1983 and New York law. *Cox v. City of New York*, No. 13–CV–163, 2014 WL 3696003, at *8–9, 2014 U.S. Dist. LEXIS 100552, at *23 (E.D.N.Y. July 23, 2014) (citing *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir.2003)). To succeed on a malicious prosecution claim under Section 1983, a plaintiff must show that (1) the defendant commenced or continued a criminal proceeding against him; (2) the proceeding was terminated in the plaintiff's favor; (3) there was no probable cause for the proceeding; and (4) the proceeding was instituted with malice. *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009); *Drummond v. Castro*, 522 F.Supp.2d 667, 677–78 (S.D.N.Y.2007).

#### 1. Weight of the Evidence

■ Defendants devote two paragraphs of their brief to their argument that the jury's finding of liability as to plaintiff's malicious prosecution claim was against the weight of evidence. This argument

contains no citations to the trial record, much less any legal authority. Instead, defendants simply assert: "Realistically, it cannot be disputed that Carlock had probable cause to lodge the trespassing charge against Genovese. Both he and Iberger personally observed Genovese in the restricted area of the base." For the following reasons, the Court disagrees with defendants. Specifically, as discussed below, the uncontroverted evidence at trial demonstrated that Genovese was never observed entering the restricted area of the base on the date in question (because she did not enter such area) and, thus, there was no basis for a trespass prosecution.

██ It is well established that "[t]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York...." *Manganiello v. City of New York,* 612 F.3d 149, 161–62 (2d Cir. 2010) (alterations, citations, and quotation marks omitted). However, in the context of a malicious prosecution claim, probable cause must relate to the specific crime charged in the criminal proceeding. *D'Angelo v. Kirschner,* 288 Fed.Appx. 724, 726 (2d Cir.2008); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 417 (2d Cir.1999). In this case, plaintiff was charged with Criminal Trespass in the Third Degree. Under N.Y. Penal Law § 140.10, "[a] person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property (a) which is fenced or otherwise enclosed in a manner designed to exclude intruders." As is clear from the text, the offense requires knowing entrance or remaining with no license or privilege to do so. *See People v. Moore,* 5 N.Y.3d 725, 727, 800 N.Y.S.2d 49, 833 N.E.2d 192 (N.Y.

2005) ("The plain language of the statute as amended, however, clearly requires that both buildings and real property be fenced or otherwise enclosed in order to increase the level of culpability from trespass (*see* N.Y. Penal Law § 140.05) to criminal trespass in the third degree.").

The undisputed facts at trial were that Undersheriff Carlock initiated charges based upon his observation of plaintiff on a public road leading towards an airbase. Carlock himself testified at trial that plaintiff never entered the air base and was never within any kind of fenced area. (Tr. 576–78.) Moreover, Carlock testified that he did not know where the air base's property line was. *Id.* Similarly, Lieutenant Iberger (who initially stopped plaintiff for taking photographs outside the base) testified that he never told Carlock or any other law enforcement official that plaintiff had trespassed. (Tr. 475–76.)

Under these circumstances, the Court concludes that the jury reasonably found that Carlock lacked probable cause to believe that plaintiff had trespassed. This determination was not against the weight of evidence, since Carlock himself conceded that plaintiff was not within the fenced area of the base. Again, the uncontroverted evidence at trial was that plaintiff was on a public road at the time she was stopped by the police. No police officer could reasonably believe plaintiff was guilty of trespass based upon those facts, and defendants have cited no case where a person was found guilty of criminal trespass for being present on a public road to an air base (or any other type of building, for that matter).[1] Accordingly, the jury's verdict was not against the weight of evidence.

1. At the close of the trial, defense counsel indicated that he wished to file a post-trial motion regarding the issue of probable cause. The Court specially requested briefing on the criminal trespass statute. Defense counsel responded "Your Honor, I will admit there is a problem with criminal trespass in the third degree ... But to the extent that there is case law on that issue, I will make sure that it is presented to the court." (Tr. 1082–82.)

### 2. Qualified Immunity

■ Defendants argue that Carlock is entitled to qualified immunity, because his belief that plaintiff had trespassed on the base was reasonable.

■ Even if a state actor deprives an individual of his constitutional rights, the doctrine of qualified immunity shields that government official from civil liability if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As the Second Circuit has noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith,* 439 F.3d 137, 147 (2d Cir.2006) (quoting *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir. 1999)).

■ "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996) (internal citations, quotation marks, and alterations omitted). In the context of a malicious prosecution claim, a police officer is entitled to qualified immunity if either: (a) the officer's belief that probable cause existed was objectively reasonable, or (b) "officers of reasonable competence could disagree on whether the test for probable cause was met." *Walczyk v. Rio,* 496 F.3d 139, 163 (2d Cir.2007) (internal citations and quotation marks omitted). The Second Circuit has defined this standard, which is often referred to as "arguable probable cause," as follows:

Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they believe to be lawful— should not be held personally liable.

*Cerrone v. Brown,* 246 F.3d 194, 202–03 (2d Cir.2001) (internal citations, quotation marks, and alterations omitted). In particular, the Second Circuit has stressed that " '[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause.... If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007). Under this standard, a police officer is entitled to qualified immunity, as a matter of law, only "if the *undisputed facts* and all permissible inferences favorable to the plaintiff show ... that officers of reasonable competence could disagree on whether the probable cause test was met." *McClellan,* 439 F.3d at 147–48 (internal citation and quotation marks omitted).

■ Applying that standard here, the Court concludes that defendant Carlock is not entitled to qualified immunity. As the Court discussed above, there was no basis for Carlock to believe that plaintiff had committed the crime of criminal trespass in the third degree, because the undisputed facts at trial[2] were that plaintiff was

---

**2.** Ordinarily, factual questions relating to the defense of qualified immunity are submitted

to a jury, but a court must make the ultimate legal determination as the applicability of the

arrested on a public road, and never passed beyond the fenced area of the air base. To the extent Carlock mistakenly believed that plaintiff had committed the crime of criminal trespass, that mistake was not reasonable as a matter of law. No reasonable police officer would have believed that plaintiff's activities on the public road leading towards the air base was conduct encompassed by the criminal trespass statute. Contrary to defendants' position, this assessment does not require any advanced legal understanding that is beyond the comprehension of the average police officer. By the plain language of the statute that Carlock himself cited in a criminal charging instrument (ECF No. 73–6 at 87), the crime of criminal trespass in the third degree is committed when a person knowingly enters an area that is fenced or otherwise enclosed in a manner to exclude intruders. A public road is not such an area, and any belief to the contrary is unreasonable as a matter of law.

Accordingly, defendants' motion for judgment as a matter of law on qualified immunity grounds is denied.

### 3. Favorable Termination Element

▮ Defendants argue that they are entitled to judgment as a matter of law, because plaintiff failed to demonstrate that the criminal prosecution terminated in her favor. For the following reasons, the Court disagrees.

▮ New York law does not require a malicious prosecution plaintiff to prove his innocence, or even that the termination of the criminal proceeding was indicative of innocence. Instead, the plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence. *See, e.g., Cantalino v. Danner,* 96 N.Y.2d 391, 729 N.Y.S.2d 405, 754 N.E.2d

164, 168 (2001) ("[T]he question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused."). As a general matter, "[d]ismissals that have been found to be inconsistent with innocence ... fall into three categories: (1) misconduct on the part of the accused in preventing the trial from going forward, (2) charges dismissed or withdrawn pursuant to a compromise with the accused, and (3) charges dismissed or withdrawn out of mercy requested or accepted by the accused." *Armatas v. Maroulleti,* No. 08–CV–310 (SJF)(RER), 2010 WL 4340437, at *13 (E.D.N.Y. Oct. 19, 2010) (internal citations omitted). However, "abandonment [of a prosecution] brought about by the accused's assertion of a constitutional or other privilege, ... such as the right to a speedy trial, does not fall within these categories, for the accused should not be required to relinquish such a privilege in order to vindicate his right to be free from malicious prosecution." *Murphy v. Lynn,* 118 F.3d 938, 949 (2d Cir.1997). Finally, a termination will be deemed favorable only when "there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense." *Smith–Hunter,* 712 N.Y.S.2d 438, 734 N.E.2d at 753.

Defendants argue that the criminal prosecution did not terminate in plaintiff's favor because it was dismissed "in furtherance of justice" pursuant to N.Y. Criminal Procedure Law § 170.30(g). Defendants contend that this disposition was not an "acquittal" or a determination on the merits of plaintiff's case and, as such, should not be considered a termination in plaintiff's favor. Additionally, defendants argue that the evidence at trial conclusively

---

defense according to the facts as the jury finds them. *Stephenson v. Doe,* 332 F.3d 68, 81 (2d Cir.2003). In this case, the County agreed

that there were no disputes of fact for the jury to resolve on the question of qualified immunity. (*See* Tr. 915.)

established that the charges were dismissed against plaintiff as a result of a compromise with the prosecution. However, for the reasons set forth below, the Court disagrees.

First, the New York Court of Appeals has explicitly rejected the notion that a plaintiff "must demonstrate innocence in order to satisfy the favorable termination prong on the malicious prosecution action." *Smith–Hunter v. Harvey*, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750, 755 (2000) (plaintiff need not demonstrate innocence where prosecution was abandoned for lack of merit and charges were dismissed on statutory speedy-trial grounds). Instead, all that is required is that the plaintiff show the disposition was not "inconsistent with innocence." *Id.* The Second Circuit has acknowledged that, after *Smith–Hunter*, it is clear that a malicious prosecution plaintiff need not establish that that the disposition of the criminal matter demonstrated her innocence. *Stampf v. Long Island R.R.*, 761 F.3d 192, 201 (2d Cir. 2014); *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir.2004) ("New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence."). Accordingly, defendants' assertion that plaintiff's claim fails solely because the criminal charges were not adjudicated on the merits is simply an incorrect statement of the applicable law in this field.

■ Second, defendants are incorrect that a dismissal in the interest of justice is, categorically, an unfavorable termination as a matter of law. On the contrary, in *Cantalino v. Danner*, the New York Court of Appeals expressly rejected the rule defendants' advance here. In that case, the Court of Appeals stated that New York precedent "did not establish a per se rule that a dismissal in the interest of justice can never constitute a favorable termination. Rather, as we stated in *Smith–Hunter*, the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused." *Cantalino*, 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (citing *Smith–Hunter*, 712 N.Y.S.2d 438, 734 N.E.2d at 755); *Stampf*, 761 F.3d at 201 (stating that *Cantalino* held that "a dismissal in the interest of justice was a favorable termination for the purposes of a malicious prosecution where 'the court's reasons for dismissing the criminal charges were not inconsistent with the innocence of the accused.'"). In accordance with the rule set forth in *Cantalino*, this Court must look to the actual basis for the underlying disposition to determine whether the grounds for dismissal were "not inconsistent with" plaintiff's innocence.[3]

■ Although the "favorable termination" prong of a malicious prosecution claim ordinarily presents a question of law, this issue must be resolved by a jury if there are questions of fact regarding the basis for dismissal of the prosecution. *See Rounseville v. Zahl*, 13 F.3d 625 (2d Cir. 1994); *Russell v. Smith*, 68 F.3d 33, 37 (2d Cir.1995); *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F.Supp.3d 267, 287 (E.D.N.Y.2014). Ordinarily, a judge dismissing a case pursuant to § 170.30(g) is

---

**3.** In so holding, the Court declines the defendants' invitation to apply the rule set forth in *Lynch v. Suffolk Cnty. Police Dep't, Inc.*, 348 Fed.Appx. 672, 674 (2d Cir.2009), which held that a dismissal in the interest of justice was *per se* an unfavorable termination. *Lynch* was a non-binding summary order issued after *Cantalino* was decided, yet *Lynch* does not cite *Cantalino*, and instead cites to precedent that pre-dates that decision. For this reason, this Court joins the other district courts that have declined to follow *Lynch*. *See Norton v. Town of Brookhaven*, 47 F.Supp.3d 152, 160 (E.D.N.Y.2014) (collecting cases).

required to state the basis for the dismissal on the record, which provides a court with a sufficient basis to make a legal determination about whether the basis constituted a favorable termination. In this case, however, the court made no specific findings. Moreover, the transcript of the proceeding does not conclusively resolve this issue for several reasons. First, the transcript reflects that there was an off-the-record discussion before the prosecutor moved to dismiss the action, and the substance of that discussion is not in the record. (Tr., Ex. A to Pl.'s Decl., ECF No. 111–2.) Second, the prosecutor and the defense attorney disputed at the conference whether the prosecution was moving to dismiss the charges based upon a mutual agreement. Specifically, the prosecutor stated the following:

> Judge, we have come to this disposition after the People have done extensive investigations in this matter whereby the People have investigated, our detectives have investigated, and also after extensive conferencing and negotiations with Defense Counsel as well, and it's based on the facts of this case. Also pursuant to our bench conference, Judge, the Defendant as a condition of this disposition will be enrolling—
> The Court: First of all, is this the only docket we have, 09–071781?
> Mr. Mashhadian: Yes. Also, Judge, just to place on the record, the Defendant will enroll, attend, and complete a ... gun safety course as a condition of the return of her firearms, and after we get notice of the same, we are going to authorize the release of those firearms to her. And also, Judge, the Defendant has executed what is called a criminal trespass warning, which is warnings issued to her that she is not to return back to the 106th Rescue location, Judge.

(*Id.*) It is therefore unclear, from this statement, whether the dismissal was the result of a compromise, since the prosecutor's statement could be interpreted to suggest that the only negotiation related to the release of plaintiff's firearms in exchange for completing a gun safety course. Indeed, plaintiff's defense attorney expressed, on the record, that this was his view of the disposition.

> Mr. Gottlieb: ... but I should make it clear that we have had conferences with Steven Kuehhas, and we made it clear that there was no crime that has been committed here. We appreciate it that the case now has been dismissed. Separate and apart from the dismissal is that certain firearms were ceased [sic] from Miss Genovese, and we have agreed that the District Attorney's office will authorize their release once [plaintiff completes a gun safety course].

*Id.* Based upon this record, the Court could not conclude, as a matter of law, that the charges were dismissed based upon mercy towards the accused or a compromise with the prosecution. Instead, viewing the transcript most favorably to plaintiff, it could be reasonably interpreted to mean that plaintiff had entered into a compromise regarding her seized property, but that the charges were dismissed based upon the prosecutor's review of the merits of the case. Although plaintiff signed a criminal trespass warning, that document merely acknowledged her receipt of a warning that was unilaterally issued by the prosecutor.

In light of these ambiguities, the Court submitted this issue to the jury for resolution of the facts underlying the dismissal. Upon review of the trial record, the Court cannot conclude, as defendants urge, that the dismissal was the product of a compromise with the prosecution. On the contrary, a reasonable jury could find that the dismissal was not the product of a compromise with the prosecution. At trial, Genovese and her defense attorney, Mr. Gott-

lieb, both testified that they never entered into any deal or compromise with the prosecution.[4] (Tr. 386–99, 424–26, 678–81, 690–93.) Defense counsel did not call any witnesses to testify about this issue. As the Court discussed above, there were factual issues precluding resolution of this issue as a matter of law, and these factual issues were submitted to the jury. The defendants have pointed to no evidence at trial that alters this analysis, and thus the Court again finds that this issue was a question of fact for the jury to resolve. The jury's verdict reflects that the jury rejected the defendants' argument that the dismissal was the product of a compromise with the prosecution. Upon review of the trial record, the Court concludes that this determination was reasonable. Accordingly, the defendants' motion for judgment as a matter of law based upon the favorable termination element is denied.

## II. MOTION TO REMIT DAMAGES

Defendants also argue that the jury's award of $1,112,000.00 in compensatory damages was excessive, and requires either a new trial on damages or remittitur of the award. For the reasons set forth below, the Court agrees.

### A. STANDARD OF REVIEW

■■■■■ It is well settled that, pursuant to Rule 59 of the Federal Rules of Civil Procedure, a trial judge has the discretion to grant a new trial if the verdict is against the weight of the evidence, and "[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)" *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *accord Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 244 (2d Cir.2004); *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir.2004). As the Second Circuit has instructed, "[w]here there is no particular discernable error, we have generally held that a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir.

---

**4.** Specifically, on direct and cross-examination, Mr. Gottlieb testified that there were no conditions attached to the dismissal, and that the prosecutor agreed to dismiss the charges before bringing up the fact that there would be a trespass warning. *See* Tr. 680–81 ("Q. Can you just tell the court and jury, was there any discussion of any conditions for the dismissal? A. No. Q. And with regard to the base. Was there any discussion with anyone at any point concerning Miss Genovese not going to the base? A. My recollection is, that issue only came up on the day of the dismissal when we were in court, and the Assistant DA indicated that they also had what I think they called a Trespass Notice, so that they would formally tell Miss Genovese in writing that she was not permitted to return, to go on the property of the base, and if she were to return, in violation of that written directive not to trespass, that she could be and would be arrested. Q. And was that a condition of the dismissal? A. No."); *see also id.* at 690–91 ("Q. Was there ever any discussion of the District Attorneys office dismissing these charges without Miss Genovese signing the criminal trespass warnings? A. Yes. Q. And what was the result of those, that conversation? A. The results were, the DA agreed to dismiss the charges."); *id.* at 692–93 ("Q. In your discussions with the DA, was that [trespass warning] a condition of dismissal? A. It never came up in any conversation with the DA when we discussed my insistence that the charges be dismissed. The only issue that was raised in any of the discussions with the DA prior to that, after I said the issue of the return of the firearms was not tied into our demand that it not be dismissed, the only discussion was that if she, separate and apart from the dismissal, sought to have the firearms returned, she would have to complete the NRA course. The issue of the trespass never came up in any conversation.")

1998) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir.1988) (internal quotations omitted)). However, if the trial judge identifies a specific error, "the court may set aside the resulting award even if its amount does not 'shock the conscience.'" *Id.* In reviewing a claim that a jury's damages award was excessive, the court must "accord substantial deference to the jury's determination of factual issues." *Martell v. Boardwalk Enters.*, 748 F.2d 740, 750 (2d Cir.1984). Moreover, "the trial judge is not called upon to say whether the amount is higher than he [or she] personally would have awarded." *Dagnello v. Long Island R.R.*, 289 F.2d 797, 806 (2d Cir.1961). Nevertheless, the Second Circuit has emphasized that "[w]hile a jury has broad discretion in measuring damages, it 'may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket.'" *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir.1993) (quoting *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.3d 565, 568 (2d Cir.1988) (internal quotation marks and citation omitted)). In other words, "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law." *Dagnello*, 289 F.2d at 806.

### B. DISCUSSION

As set forth in detail below, the Court concludes that the jury's compensatory damages award of $1,112,000 in this case was excessive as a matter of law and warrants a remittitur of damages. In short, the Court finds that the award is so high that it shocks the judicial conscience and constitutes a denial of justice. Thus, the award of compensatory damages must be set aside.

### 1. Plaintiff's Summation

■■ Defendants move for relief from the jury's compensatory damages award, arguing that the award was excessive as a matter of law, and likely caused by plaintiff's summation, which urged the jury to award damages for harms that were not recoverable. In his summation, plaintiff's counsel asked the jury to award:

- $37,000 for legal fees incurred by plaintiff's criminal defense;
- $3,260 for fees associated with posting bond;
- $2,150 in insurance co-pays;
- $6,000 for money taken from plaintiff's car at the time of her arrest, which was not returned to plaintiff;
- $50,000 for pain and suffering caused by lack of adequate medical treatment while incarcerated;
- $20,000 for being strip searched;
- $580,000 for embarrassment, humiliation, and emotional distress caused by the prosecution; and
- $340,000 for "malicious prosecution." [5]

(Tr. 955–958.) This list totaled $1,005,110, and the jury awarded $1,112,000. Defendants argue that plaintiff's request to the jury was erroneous, since it asked the jury to award damages for harms that were not recoverable. For the following reasons, the Court agrees that plaintiff's summation caused an erroneous damages award.

As a threshold matter, the Court clearly instructed the jury that "the plaintiff's attorney's statements, if any, to you of the amount of damages you should award the

---

**5.** Plaintiff's counsel also requested $15,000 for plaintiff's claim of battery, which was premised on plaintiff's allegation that Carlock spat in her face. The jury did not find liability on this claim, and the Court has no reason to believe that the amount of compensatory damages awarded by the jury incorporated plaintiff's request of $15,000 in damages.

plaintiff are not binding upon you. It is not evidence; it is only the statement of the plaintiff's attorney." (Jury Instruction, ECF No. 97 at 24.) Moreover, defendants did not object to plaintiff's summation during the trial, and did not request a curative instruction from the Court. Nevertheless, the Court agrees with defendants that plaintiff's summation lead the jury to award an excessively high amount of compensatory damages.

Among the items on this list, defendants contend that it was improper for plaintiff's counsel to request: (1) compensation for money seized at the time of plaintiff's arrest ($6,000), (2) compensation for a strip search conducted by correction officers that "bordered on sexual abuse" ($20,000), (3) compensation for inadequate medical treatment in jail ($50,000), and (4) damages for "malicious prosecution" in addition to emotional damages. Defendants contend that these damages were not recoverable, as the first category addressed damages that occurred before plaintiff's arraignment, and the latter two categories addressed unforeseeable harms caused by third parties. Defendants also argue, broadly, that the jury likely awarded damages for harms that occurred before plaintiff's arraignment, because plaintiff testified in detail about the circumstances of her arrest, and plaintiff's counsel highlighted these issues in his summation. Lastly, defendants argue that the latter two categories of damages ($580,000 for pain and suffering, and $340,000 for "malicious prosecution") are duplicative.

■■■ Turning to the substance of defendants' arguments, the Court agrees that defendant Carlock cannot be held liable for money seized from the plaintiff before her arraignment, and plaintiff does not seriously argue otherwise. Nor can Carlock be held liable in damages for plaintiff's medical treatment while plaintiff was jailed at the Suffolk County Correctional Center. Neither of these two claims for damages were reasonably related to plaintiff's claim of malicious prosecution, especially considering that Carlock was not involved in plaintiff's detention beyond her initial arrest, and plaintiff never claimed that Carlock knew about the injury to her leg.[6]

■■■ Defendants also contend that plaintiff's counsel implicitly asked the jury to compensate plaintiff for harms sustained before her arraignment, whereas a claim for malicious prosecution is measured from the time the plaintiff is first detained pursuant to judicial process. *Wallace v. Kato*, 549 U.S. 384, 389–90, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). As a threshold matter, the Court clearly instructed the jury on this issue:

> With respect to a claim for malicious prosecution or retaliatory prosecution, in addition to any proximately caused damages for physical harm, embarrassment, or emotional suffering from the wrongful confinement *after the arraignment*, a plaintiff is also entitled to be compensated for the loss of liberty for the period spent in wrongful confinement *after the arraignment*.

(*Id.* at 26 (emphasis added.)) In addition, the Court also instructed the jury that the lawfulness of plaintiff's arrest and the alleged misconduct of correction officers in the jail were not at issue in the case. (*Id.* at 97–98.) Moreover, as noted above, no objection on this ground was made during, or after, the summation of plaintiff's counsel.

---

**6.** By contrast, plaintiff's allegations regarding the strip search she experienced after her arraignment (Tr. 222) was a clearly foreseeable aspect of plaintiff's post-arraignment detention. The Court does not believe that there is anything outrageous about an award of $20,000 for a strip search, regardless of the nature of the search.

The Court has no reason to conclude that the jury ignored these clear legal instructions, and simply lumped all damages arising only from the arrest itself into their award for the malicious prosecution. Such an argument by the defendants is "at odds with the law's general assumption that juries follow the instructions they are given." *United States v. Agrawal*, 726 F.3d 235, 258 (2d Cir.2013). However, notwithstanding the Court's legal instructions (which this Court believes the jury followed), plaintiff counsel's summation may have unwittingly led the jury into double counting on certain permissible categories of damages, and may have confused the jury factually as to the number of hours plaintiff spent in jail *after the arraignment* (as opposed to the total amount of time she spend in jail from the time of arrest). First, the Court agrees with defendants that plaintiff's request for $580,000 for pain and suffering and $340,000 for "malicious prosecution" was problematic because it encouraged double-counting. The summation asked the jury to award these amounts in the following manner, as he listed these requests on a chart:

> With regard to the embarrassment and I'm just going to put pain and suffering, that being the humiliation, the demeaning aspect of it, the years that she's gone through that, and its aftermath, what happened that she's experiencing even today, $580,000.

> And, ladies and gentlemen, I'm just going to put malicious prosecution here. For the malicious prosecution, and the time that she actually spent in that jail, the four days and five nights, went through and tried to calculate it. It was about 95 hours, or 5,700 minutes, or

342,000 seconds that she had to endure that and her mind was in as much of a suicide gown as her body was, and just so you know, 342,000 seconds, I had to calculate it twice, but we are going to ask for that she be compensated $340,000.

(Tr. 957–58.) There were two problems with these requests. First, these categories of damages were clearly overlapping, since the category of "malicious prosecution" as counsel described it obviously encompasses emotional distress suffered during plaintiff's period of incarceration. Although plaintiff argues that the category of malicious prosecution was distinct because it was intended to express only plaintiff's deprivation of liberty, the phrasing of plaintiff's request clearly referenced plaintiff's emotional distress. More importantly, the term "malicious prosecution" for this category was misleading, if it was intended to cover only the time plaintiff spent in prison, since clearly a tort of malicious prosecution continues until the charges are terminated, which in this case happened months after plaintiff was released from prison.

As a second matter, although defendants do not point this out in their brief, the arithmetic counsel employed in his summation makes clear that he asked the jury to award damages for plaintiff's detention prior to her arraignment. Counsel asked the jury to award a figure based on a period of ninety-five hours in custody, over four days and five nights.[7] However, plaintiff submitted a letter to the Court after the oral argument on this motion, and that letter appears to acknowledge that plaintiff spent "some 78 hours in custody from July 31st when arraignment

---

7. Plaintiff's brief omits this section of the transcript in the portion that addresses this issue. (*See* Pl. Opp. Mem. at 14 (characterizing the request as "$340,000 for the malicious prosecution, and the time that she actually spent in that jail that she had to endure that and her mind was in as much of a suicide gown as was her body.").)

took place until her posting bail on August 3rd." (Letter, ECF No. 117 at 2.) Plainly, the ninety-five hour time figure in plaintiff's summation encompassed plaintiff's detention prior to her arraignment. Thus, plaintiff's counsel impermissibly encouraged the jury to award damages for her pre-arraignment detention.[8]

 Although the jury awarded plaintiff more than her attorney requested in damages, the verdict is close enough to the damages request that the Court recognizes that the summation played a substantial part in the jury award. Having determined that a substantial portion of plaintiff's damages request in summation was duplicative and sought damages that were not recoverable on the malicious prosecution claim, these errors alone entitle the defendants to relief from the jury's verdict. In sum, the Court concludes that plaintiff's counsel encouraged the jury to award excessive and duplicative damages. In any event, even if these errors had not occurred, the Court nevertheless concludes that the compensatory damages award was grossly excessive for the reasons discussed below.

In determining that the award was grossly excessive, the Court considers awards in similar cases. *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir.1990). To that end, the Court finds particularly instructive Chief Judge Amon's analysis in *Morse v. Fusto*, No. 07–CV–4793 (CBA), 2013 WL 4647603, at *27–31, 2013 U.S. Dist. LEXIS 123823, at *82–94 (E.D.N.Y. Aug. 29, 2013). In that case, a dentist had been charged with fraud for his billing practices, and was acquitted after a trial. *Id.* Although the plaintiff was subject to court-ordered appearances while the charges were pending, it does not appear that he was ever incarcerated as a result of the charges. The jury awarded $2,500,000 for "mental and emotional pain and suffering," which Judge Amon remitted to $400,000. *Id.* at *29–30, 2013 U.S. Dist. LEXIS 123823, at *91. In making that determination, the court looked to two comparable cases: *Martinez v. Port Auth.*, No. 01 Civ. 721(PKC), 2005 WL 2143333, at *17, 2005 U.S. Dist. LEXIS 19141, at *50 (S.D.N.Y. Sept. 2, 2005), and *Komlosi v. Fudenberg*, No. 88 Civ. 1792(HBP), 2000 WL 351414, at *8, 2000 U.S. Dist. LEXIS 4237, at *26 (S.D.N.Y. Mar. 31, 2000). *Id.* at *28–29, 2013 U.S. Dist. LEXIS 123823 at *88–89. In *Martinez*, the court remitted an award for false arrest and malicious prosecution claims to a total of $460,000 in non-economic damages, in a case where the plaintiff was detained for 18 hours and prosecuted to trial. *Martinez*, 2005 WL 2143333, at *17, 2005 U.S. Dist. LEXIS 19141, at *50, *aff'd*, 445 F.3d 158 (2d Cir. 2006). In *Komlosi*, the court remitted an award of $5.23 million in non-economic damages to $500,000, in a case where the plaintiff was detained for two weeks on

---

8. Defendants also appear to be arguing that the jury should not have awarded damages for plaintiff's period of incarceration *at all*, because these damages were attributable to the intervening actions of the prosecutor assigned to the case. This argument lacks merit. Plaintiff's theory of the case was that Carlock falsely told prosecutors that plaintiff had trespassed on the airbase, when he had no reason to believe that she had done so, and it is well established that a police officer cannot escape liability by relying on "the existence of a superseding cause when that subsequent decision-maker has been deceived by the defendant's actions." *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir.2007). Likewise, the Court disagrees that the criminal court's decision to set bail in the amount of $50,000 was an intervening act that broke the chain of causation. Although plaintiff was only charged with criminal trespass (a misdemeanor), Carlock himself cast plaintiff as a would-be terrorist in a press release he participated in drafting, and this Court cannot conclude that a police officer arresting a suspect under such circumstances could not foresee that the individual would be required to post substantial bail.

charges of rape and forcible sodomy. *Komlosi*, 2000 WL 351414, at *8, 2000 U.S. Dist. LEXIS 4237, at *26. Taken together, the opinions in *Morse, Martinez*, and *Komlosi* provide guidance as to the reasonable range of comparable malicious prosecution awards, but are imperfect comparators since *Morse* did not involve any significant deprivation of liberty, *Martinez* involved a shorter period of detention than Genovese suffered, and the awards in both *Komlosi* and *Martinez* do not account for present-day values because they are, by now, at least a decade old.

■ This Court's task, when evaluating a request for remittitur of damages, is to determine whether the award was within the "limit of a reasonable range." *Anderson v. Metro–North Commuter R.R.*, 493 Fed.Appx. 149, 151 (2d Cir.2012) (citing *Ismail*, 899 F.2d at 186). To that end, this Court must also determine the upper range of comparable awards. At oral argument, the Court asked plaintiff to point to any case that had upheld a compensatory damages award in excess of a million dollars in a malicious prosecution case involving a similar time period of incarceration. Plaintiff has provided no such authority, and the Court is not aware of any such a case. However, in *Ismail v. Cohen*, the Second Circuit found a New York state decision upholding a malicious prosecution verdict for $750,000 to be instructive. *Ismail*, 899 F.2d at 187 (citing *Vitale v. Hagan*, 132 A.D.2d 468, 517 N.Y.S.2d 725 (1st Dep't 1987), *modified on other grounds*, 71 N.Y.2d 955, 524 N.E.2d 144, 528 N.Y.S.2d 823 (1988)). However, it is unclear from that decision whether the award of compensatory damages included economic damages, such as lost wages, which could have represented a significant portion of the award. Nevertheless, this case provides the Court with a useful frame of reference. Also of assistance to the Court is the Second Circuit's observation (in dicta) in *Jocks v. Tavernier*, 316

F.3d 128, 137 (2d Cir.2003), that the district court did not unreasonably decline to remit $622,000 in damages for a false arrest and malicious prosecution claim.

In light of this range of authorities, the Court concludes that the award in this case was grossly excessive. The Court recognizes that plaintiff's particular injuries in this case were acute. Plaintiff spent 78 hours in prison and defended against criminal charges for an additional four months following her release. The Suffolk County Sheriff's office released a press release about the incident, describing plaintiff as a terrorist. Plaintiff's therapist testified that the incident caused plaintiff to suffer from emotional problems and post-traumatic stress disorder, and plaintiff's two sons testified that plaintiff has never been the same since she was released from jail. In fact, at plaintiff's arraignment, her own attorney requested that she be placed on suicide watch, based upon her extreme emotional disturbance in response to her detention. However, even considering these factors, the Court does not believe that the evidence at trial demonstrated damages that were more than double the amount granted in *Morse, Martinez*, and *Komlosi*, especially in light of the fact that, in this case, plaintiff was not forced to defend against charges at a criminal trial.

Thus, having borne in mind, as it must, this case's "unique set of facts and circumstances," *Scala*, 985 F.2d at 684, the Court concludes that $1,112,000 is grossly excessive, particularly in light of comparable jury awards. In sum, the Court concludes that the compensatory damages awarded by the jury was grossly excessive, shocks the judicial conscience, and was a clear miscarriage of justice. Plaintiff encouraged the jury to award $920,000 in purely non-economic damages by asking the jury, in part, to double-count damages and

award damages for pre-arraignment harms. The result of this request was a grossly excessive award of compensatory damages. Even if the jury did not rely upon these arguments and there were no specific errors, the verdict is still grossly excessive and shocks the judicial conscience because, for all of the reasons discussed *supra*, the compensatory award cannot be justified by any rational calculation of the damages that could possibly be supported by the trial record.

The Court will now turn to an analysis as to whether the excessive award can be addressed by remittitur or whether a new trial on damages is warranted.

### 2. Remittitur

 If the trial judge determines that the damage award is excessive as a matter of law under the above-referenced standard, the judge must next decide whether to order a new trial on damages or enter a conditional order of remittitur, which compels a plaintiff to decide whether to accept the court's proposed reduction of the excessive verdict or to opt for a new trial. *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir.1990). As to determining when remittitur is appropriate, the Second Circuit has explained: [W]e have found remittitur appropriate in at least two distinct cases: "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken ... and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus can be ascribed to a particular, quantifiable error." *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir.1993) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984)); accord *Kirsch*, 148 F.3d at 165. It is important to emphasize that "[c]rucial to the practice of remittitur in

either kind of case is the requirement that the court confine its role to the removal of the excess portion of the verdict so that the 'damage calculation leaves in the judgment a portion of what the jury awarded.'" *Shu–Tao Lin*, 742 F.2d at 49 (quoting *Akermanis v. Sea–Land Serv., Inc.*, 688 F.2d 898, 902 (2d Cir.1982)).

 With respect to whether remittitur is possible under the circumstances of this particular case, the Court concludes that the jury's verdict does not reflect prejudice, and was not the result of any identifiable error in the presentation of evidence or the instructions to the jury. Instead, the verdict here was excessive due to identifiable errors in plaintiff's summation. Under these circumstances, it is appropriate for the Court to remit the award instead of ordering a new trial on the issue of damages. The Court must therefore remit the award and settle on an amount of compensatory damages. In fixing such a number, the Court is mindful that it should "remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Earl*, 917 F.2d at 1330.

 Upon review of the range of awards in comparable cases, the Court concludes that the award should be remitted to $700,000. The Court bases this figure on the cases discussed above, but has adjusted the figure upwards to reflect that: (1) plaintiff was incarcerated for 78 hours, whereas the plaintiff in *Morse* was not jailed; (2) the compensatory damages figures in the cases discussed above were solely for the noneconomic harms in those cases, and it is conceded in this case that plaintiff suffered at least $40,000 in economic damages; (3) unlike the plaintiff in *Morse*, plaintiff suffered more than garden variety emotional distress, and it is clear to the Court from observing plaintiff's demeanor at trial that she was greatly affect-

ed by her detention and prosecution. In particular, the Court notes that plaintiff's psychologist testified to her ongoing treatment for post-traumatic stress disorder, plaintiff's two sons testified that she has not been the same since her release from jail, and plaintiff's own criminal defense attorney requested that she be placed on suicide watch after observing her demeanor at her arraignment.

Therefore, having considered all of the relevant factors, the Court remits the compensatory damages award to $700,000.[9]

### III. CONCLUSION

For the foregoing reasons, the Court is denying the defendants' motion for judgment as a matter of law. However, the Court is conditionally ordering a remittitur of damages to $700,000. Plaintiff shall notify the Court within thirty days whether she consents to the remitted award.

SO ORDERED.

---

9. The Court notes that this figure is roughly equal to the jury award, after subtracting the impermissible damages categories from the summation and subtracting approximately $340,000 of the overlapping damage requests. Finally, in reaching this decision, the Court emphasizes that it is certainly not suggesting that every case involving a period of incarceration for several days merits such an award, or even an award close to this amount. Instead, the Court is considering the specific (and unique) facts of this particular case, in which the plaintiff suffered extreme and ongoing emotional distress as a result of her prosecution and the resulting detention, and which included a press release characterizing her as a potential terrorist. Given those particular facts, the Court concludes that $700,000 removes the surplus that can be ascribed to particular errors in plaintiff's summation, and such an amount can be reasonably supported by the evidence in the case and comparable verdicts.